[No. C042165. Third Dist. June 17, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
MARKELLE NEAL TAYLOR, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts IV, V, VII, and IX of the Discussion.

**COUNSEL**

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Jo Graves, Assistant Attorneys General, J. Robert Jibson and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SIMS, Acting P. J.**—On August 9, 2001, defendant Markelle Neal Taylor punched his girlfriend, Garvon White, six times hard in the stomach when White was seven months pregnant with defendant's child.

On the same day, the child, Marcel Taylor, was delivered by Caesarean section surgery and was born alive. However, the baby died about a month later from necrotizing intercolitis; the baby's small bowel was almost entirely dead.

A jury convicted defendant of the second degree murder of Marcel Taylor, a human being (count 1; Pen. Code, § 187, subd. (a); undesignated section references are to the Penal Code) and the infliction of corporal injury resulting in a traumatic condition on Garvon White (count 2; § 273.5, subd. (a)). The jury found as to count 2 that defendant personally inflicted great bodily injury upon White under circumstances involving domestic violence (§ 12022.7, subd. (e)), and that with intent to injure and without consent defendant personally inflicted injury upon White, whom he knew or should have known was pregnant, and the injury resulted in the termination of the pregnancy (§ 12022.9, former subd. (a); see fn. 10, *post*).

Sentenced to 15 years to life in state prison, defendant contends: (1) Defendant could not properly be convicted of the murder of a human being based on an act that occurred before the human being came into existence. (2) The trial court erred by defining implied malice in terms of a conscious disregard for "human life," rather than "fetal life." (3) There was insufficient evidence to convict defendant on count 1: because the victim died of natural causes, defendant was not the legal or proximate cause of his death. (4) The trial court should have instructed the jury sua sponte on the People's burden of proving proximate cause. (5) The trial court committed reversible error under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*). (6) The trial court erred by failing to instruct sua sponte on attempted murder of a fetus as a lesser included offense to murder. (7) The trial court erred by instructing the jury pursuant to CALJIC No. 8.51 that if a person causes another's death, while committing a felony that is dangerous to human life, the crime is murder. (8) The evidence did not support the jury's finding that defendant terminated Garvon White's pregnancy. (9) The prosecutor committed prejudicial misconduct by violating a court order. (10) The trial court erred in sentencing by failing to award defendant presentence custody credits.

In an unpublished portion of the opinion, we consider and reject contentions (4), (5), (7), and (9). In the published portion, we consider and reject

defendant's remaining contentions. We shall therefore affirm the judgment, but shall award defendant the custody credits to which he is entitled and direct the trial court to prepare a corrected abstract of judgment reflecting the award of credits.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2001 defendant lived with Garvon White in Sacramento.[1] White was seven months pregnant with defendant's child.

On August 9, White and defendant argued. She told him he could pack his things and leave. He got angry and punched her in the head. White said she would do what the mother of his other children had done—take his baby and leave so he could not see it. She knew this would anger him.

Defendant punched White twice in the stomach, knocking her down. He kept on hitting her while she was on the floor as he spoke to his brother on the telephone. Looking sweaty and crazed, he yelled: "I don't want this baby." "I don't want this bitch to have my baby." He hit her six times in the stomach altogether.[2]

White felt a knot in her stomach and became frightened. Defendant said he was afraid he had killed or hurt the baby. He later said to a neighbor that he had screwed up and did not want to be charged with murder if the baby died.

White walked across the street to a fire station. A paramedic, after interviewing her, had her transported by ambulance to the hospital where Dr. Derek Wong, White's obstetrician/gynecologist, was on duty. Dr. Wong had cared for White during her pregnancy, which had been uncomplicated up to then, with a delivery due date of October 31.

White told Dr. Wong defendant had hit her five or six times in the stomach and she was cramping. Dr. Wong found significant bruising. After performing a maternal blood test, a fetal heart rate check, and an ultrasound examination, he decided to perform an immediate Caesarean section surgery (C-section).

---

[1] All further dates are in 2001 unless otherwise stated.

[2] At trial, White testified that she could not recall telling the police defendant had hit her six times and claimed she had exaggerated the severity of the assault out of anger. Before trial she had falsely told a defense investigator that another woman punched her in the stomach, not defendant.

White was an extremely reluctant witness who testified in custody after evading subpoena and being brought in on a bench warrant. Although she told a story generally in line with her prior statements (aside from that given to the defense investigator), she minimized defendant's actions as far as possible and portrayed herself as habitually violent toward defendant and others.

He suspected internal bleeding from a placental abruption, or premature separation of the placenta from the uterine wall, which could kill the fetus from ongoing blood loss.

On performing the C-section, Dr. Wong discovered a placental abruption which had produced blood inside the amniotic fluid and a large blood clot. The beating White had described could cause such an injury. There was no evidence that anything else had caused it.

When delivered by C-section on August 9, the baby (named Marcel) was just over 28 weeks old and weighed less than three pounds. Although 80 to 90 percent of babies born that prematurely survive, there are always complications, and such a baby needs months of care to be able to live outside the nursery.

Marcel also had Down's syndrome, including a heart defect normally repairable by surgery. His premature birth did not cause these conditions, but it made them harder to treat.

Dr. Faisal Ezzedeen, a neonatologist, put Marcel on life-support systems, then began treating him for the problems caused by his heart defect and by the immaturity of his lungs and gastrointestinal tract.

One risk caused by prematurity is necrotizing intercolitis, a condition almost never found in full-term babies. It develops some time after birth, often very suddenly. In this condition, believed to result from the underdeveloped state of the infant's digestive system, an infection takes hold in the small bowel, which causes the mucosa to slough off, sometimes leading to necrosis and perforation.

Marcel was fed through a tube for the first week after his delivery. Oral feeding began on August 17.

On September 5, Marcel's abdomen distended and he began spitting up his food. The treatment team determined necrotizing intercolitis had set in. Antibiotics did not help. Exploratory surgery found that the small bowel was almost entirely dead, an inevitably fatal condition. Taken off life support, Marcel died.

In Dr. Ezzedeen's opinion, it was extremely unlikely that Marcel would have developed necrotizing intercolitis if born at term; Dr. Ezzedeen had treated over 100 cases and had never seen one in a full-term baby. He could not exclude Marcel's heart defect as a risk factor for the condition, but it was

not the cause. The medical community does not know why the condition is more severe in some infants than in others.

Dr. Gregory Reiber, a forensic pathologist, performed an autopsy on Marcel on September 6. He opined that death occurred due to complications of prematurity, with the additional complicating factor of a congenital heart defect. At 28 weeks, Marcel was very premature, almost extremely so; babies born that prematurely can develop malfunctions of the brain, lungs, intestines, liver, and kidneys.

In Dr. Reiber's opinion, Marcel's prematurity was the "proximate cause" of death, but it was also "a primary factor leading to the [necrotizing intercolitis]." This can be so because immature lungs deliver insufficient oxygen to the intestinal tract, and because oral feeding can lead to gastrointestinal difficulties. Marcel's inadequate lung development had caused respiratory diseases and brain hemorrhages before his death.

According to Dr. Reiber, if Marcel had been born at term with the same Down's syndrome and heart defect, he would have had only a 5- to 6-percent risk of mortality. However, the heart defect increased his risk for the complications associated with prematurity.

On August 10, Garvon White told Laura Bardman Murray, a social worker, that she and defendant had been in a violent relationship for a year; once he broke her arm while she was pregnant. On August 12, White told Murray defendant had beaten her abdomen another time during the pregnancy but she had not reported it.

Thelma Cruz-Taylor, defendant's estranged wife and the mother of his children, testified that defendant had repeatedly slapped and struck her while she was pregnant. In 1998, after she had left him and taken the children, he came to her apartment, told her he would be happy only if she were dead, and choked her.

Additional facts appear below as relevant to particular issues.

## DISCUSSION

### I

Defendant contends he could not properly be convicted of murdering Marcel, "a human being," because "[t]he fatal act . . . occurred before Marcel was born." He asserts that the issue turns on whether a fetus is considered a human being in the eyes of the criminal law. He then concludes that under

section 187, which distinguishes between the murder of a fetus and the murder of a human being, he could properly have been convicted, if at all, only of the former offense.[3] We disagree.

As we shall explain, defendant's first premise is flawed. In defining the offense in this case, the law looks to the instant of death, not to when defendant did the act that ultimately caused death. Because Marcel was a human being when he died, defendant's conviction for the murder of a human being was proper.

■ At common law, when a child was born alive but subsequently died due to injuries inflicted before birth on the mother, the crime was murder or manslaughter; if the child was born dead, there was no homicide. (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 96, p. 712; hereafter, Witkin & Epstein.) Section 187 did not modify that common law rule as to live-born babies. (*Id.* at pp. 712–713.)

■ If a fetus is born alive after an attack on the mother but subsequently dies, it is a human being at the time of death for purposes of the manslaughter statute. (§ 192; *People v. Dennis* (1998) 17 Cal.4th 468, 505–506 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Unlike section 187, section 192 does not cover the killing of a fetus. However, it would be illogical to conclude that once a fetus has been born it is a human being for purposes of manslaughter but not for purposes of murder. The only distinction between a manslaughter case and a murder case on such facts is whether the defendant's attack on the mother was spurred by malice aforethought toward the fetus. This distinction has no bearing on whether the victim is a human being within the meaning of section 187.

■ We conclude that if (1) a defendant, acting with malice aforethought toward the fetus in a woman's womb, assaults the woman; (2) in consequence, the fetus must be delivered prematurely; and (3) the fetus is born alive but later dies of causes to which the prematurity contributed substantially, the defendant has murdered a human being. (§ 187, subd. (a); see *People v. Dennis, supra,* 17 Cal.4th 468, 505–506; 1 Witkin & Epstein, *supra,* § 96, pp. 712–713.)

■ Defendant asserts that such a construction of section 187 amounts to an unacceptable "relation back" theory of culpability. Defendant is mistaken.

---

[3] Section 187 provides as relevant:
"(a) Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.
"(b) This section shall not apply to any person who commits an act that results in the death of a fetus if [it is a lawful therapeutic abortion].
"(c) Subdivision (b) shall not be construed to prohibit the prosecution of any person under any other provision of law."

As we have shown, the law of manslaughter, as explained in *People v. Dennis, supra,* 17 Cal.4th 468, defines the defendant's crime by the victim's status as a human being at the time of the victim's death, even if the acts that proximately caused his death occurred before his birth. By analogy, so should the law of murder. Nothing is "relat[ed] back": the law simply takes the victim as it finds him.

Defendant relies on *Justus v. Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122] (*Justus*) (disapproved on other grounds in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171 [216 Cal.Rptr. 661, 703 P.2d 1]), which held that under California's wrongful death statute, triggered by the death of a "person" (Code Civ. Proc., former § 377; see now § 377.60; Stats. 1992, ch. 178, §§ 19–20, p. 890), a cause of action would not lie for the death of a stillborn fetus. His reliance is misplaced.

In *Justus, supra,* 19 Cal.3d 564, the court found that the Legislature had not expressly incorporated the definition of "an existing person" in Civil Code former section 29 (repealed by Stats. 1993, ch. 19, § 2, p. 1578), which included a fetus, into the wrongful death statute, and held that the Legislature had thus impliedly excluded fetuses from the statute's coverage. (*Justus, supra,* at pp. 578–579.) The court also noted that the Legislature had "specially identified the object of its concern," either by express language or the incorporation of Civil Code former section 29, "in the limited instances in which the Legislature has extended the protection of the criminal law to the unborn child." (*Justus, supra,* 19 Cal.3d at p. 578.)

Defendant asserts *Justus, supra,* 19 Cal.3d 564, in effect created a rule that criminal liability based on harm to a live child from "a prenatal act" can stem only from a statute analogous to Civil Code former section 29 or expressly incorporating it. He is wrong for several reasons.

First, the sole issue in *Justus, supra,* 19 Cal.3d 564, was how to construe the wrongful death statute; thus the court's discussion of criminal law is dictum. Second, the court grounded its holding on the premise that the wrongful death cause of action, as a pure creature of statute, must be limited to the precise terms used by the Legislature (*id.* at p. 575); by contrast, section 187 codifies the common law of murder and has not changed it in any material way. (See 1 Witkin & Epstein, *supra,* § 96, pp. 712–713.) Third, defendant has not shown that "human being" as used in section 187 is synonymous with "person" as used in the civil law, whether in the wrongful death statute (Code Civ. Proc., § 377.60) or in Civil Code former section 29. Lastly, as we have explained, the victim in this case was not an "unborn child" as the term is used in *Justus.*

Defendant also cites *Reyes v. Superior Court* (1977) 75 Cal.App.3d 214 at pages 218–219 [141 Cal.Rptr. 912] (*Reyes*), which held in reliance on *Justus, supra,* 19 Cal.3d 564, that the alleged mistreatment of a fetus will not support a criminal prosecution for child endangerment (§ 273a). However, *Reyes* is distinguishable because the alleged criminal conduct constituting endangerment (the mother's use of heroin while pregnant), including the resulting harm (fetal addiction), was complete before the fetuses were born. (*Reyes, supra,* 75 Cal.App.3d at p. 216.)

In conclusion, defendant has failed to show that he could not be convicted for the murder of a human being on the facts in this case.

## II

■ Building on his previous argument, defendant contends the trial court erred by instructing the jury that implied malice is a killing resulting from an intentional act, the natural consequences of which are dangerous to *human* life. In defendant's view, the trial court should have instructed sua sponte that proof of implied malice required a showing that defendant assaulted the mother in conscious disregard of *fetal* life. Having rejected defendant's previous argument, we necessarily reject this one.

## III

Defendant contends there was insufficient evidence to support his conviction for murder because the People failed to prove defendant's conduct caused Marcel's death, which occurred due to "natural causes . . . nearly one month after he was born." We conclude there is sufficient evidence that defendant's conduct caused Marcel's death.

■ We review insufficient-evidence contentions in criminal cases by viewing the evidence in the light most favorable to the judgment and deciding whether there is substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. (*People v. Staten* (2000) 24 Cal.4th 434, 460 [101 Cal.Rptr.2d 213, 11 P.3d 968]; *People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) If the answer is affirmative, the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal. (*People v. Bean* (1988) 46 Cal.3d 919, 932–933 [251 Cal.Rptr. 467, 760 P.2d 996].)

"The criminal law . . . is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act." (*People v.*

*Roberts* (1992) 2 Cal.4th 271, 319 [6 Cal.Rptr.2d 276, 826 P.2d 274].) In determining whether a defendant's acts were the proximate cause of the death of a human being, we ask whether the evidence sufficed to permit the jury to conclude that the death was the natural and probable consequence of defendant's act. (*Id.* at p. 321.) As we shall explain, the evidence adduced at the trial of this case satisfies this test.

Defendant points to the evidence that medical science does not know for certain what causes necrotizing intercolitis, that the condition can occur in full-term babies, that it is less likely to occur fatally in babies born at 28 weeks than in those born two or three weeks younger, and that Marcel's Down's syndrome-related heart defect carried a measurable risk of mortality even if he had been delivered at term.

Although defendant does not fully spell it out, we take his argument to be that Marcel's preexisting heart defect could have been the sole cause of death because it rendered him vulnerable to necrotizing intercolitis regardless of the circumstances of his birth, and that the prosecution did not prove the contrary beyond a reasonable doubt. Defendant cannot hope to prevail merely by arguing the heart defect was a contributing cause of death: even if true, this claim would not relieve him of responsibility for his own acts. (See *People v. Phillips* (1966) 64 Cal.2d 574, 577–579 [51 Cal.Rptr. 225, 414 P.2d 353]; *People v. Scola* (1976) 56 Cal.App.3d 723, 726 [128 Cal.Rptr. 477].)

■ Contrary to defendant's position, the jury here could reasonably have concluded that Marcel's death was the natural and probable consequence of defendant's punching Garvon White. It was undisputed that defendant's assault on White forced the immediate and grossly premature delivery of Marcel. It was also undisputed that from the time of his birth to the time of his death, Marcel suffered from debilitating conditions caused by his prematurity and which would not have existed but for the prematurity. The immediate cause of Marcel's death, necrotizing intercolitis, is almost never seen except in premature babies. Dr. Ezzedeen, the main prosecution expert on that point, had seen over 100 cases, but not one in a baby born at full term.[4] Dr. Ezzedeen and Dr. Reiber explained how the many forms of vulnerability a premature infant experiences can expose him to necrotizing intercolitis. Dr. Reiber also testified to other forms of injury Marcel had incurred before his death arising out of those same vulnerabilities. Altogether, this evidence constituted an overwhelming showing that defendant's assault on White was the proximate cause of Marcel's death.

---

[4] Defendant cites the testimony of Dr. Reiber, the forensic pathologist, that the condition can happen in full-term infants. Dr. Reiber gave no evidence as to the probability or frequency of such an occurrence, however. Thus his testimony did not contradict that of Dr. Ezzedeen.

On the other hand, there was no substantial evidence to support the claim that Marcel's heart defect would have caused his death if he had not been born almost two months prematurely. Although there was evidence that it would have increased his risk of mortality by a small percentage if he had been born at full term, there was no evidence that it would have increased his risk of developing necrotizing intercolitis under those circumstances. There was only the skimpiest evidence that full-term babies can develop that condition (an undeveloped allusion to the medical literature, with no showing as to probability or frequency). And there was no evidence whatever that any full-term baby has ever died of that condition.

■ But even if the jury could have concluded that Marcel's preexisting heart defect contributed to his death, that would not have relieved defendant of his responsibility for the death. As the courts have made clear, a defendant whose infliction of physical injury upon another is a cause of that person's death is guilty of unlawful homicide even if the injury was not the only cause of death, and even if the victim was in a weakened state due to a preexisting condition. (*People v. Phillips*, *supra*, 64 Cal.2d at pp. 577–579; *People v. Stamp* (1969) 2 Cal.App.3d 203, 207–209 [82 Cal.Rptr. 598]; see CALJIC No. 8.58.) Although the first victim of physical injury from defendant's act was Garvon White, Marcel was the ultimate victim of that injury, in that the premature delivery it forced rendered him vulnerable to the condition that killed him.

Substantial evidence supports the jury's conclusion that defendant caused the death of Marcel Taylor.

## IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI

■ Defendant contends the trial court erred by failing to instruct sua sponte on attempted murder of a fetus as a lesser included offense to murder. He reasons that if his assault on Garvon White was meant to kill the fetus, that intent was thwarted by the fetus's subsequent delivery, rendering his crime one of attempt only. On this reasoning, substantial evidence supported a conviction for attempted murder of a fetus and the trial court therefore should have instructed on that "lesser included offense" sua sponte. We disagree because attempted murder *of a fetus* is not a lesser included offense to murder *of a human being*, the offense charged in the information on which the case went to trial.

---

*See footnote, *ante*, page 628.

"California law requires a trial court, *sua sponte*, to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149 [77 Cal.Rptr.2d 870, 960 P.2d 1094], italics added.)

■ An offense is a lesser included offense to a charged offense if the former is necessarily included in the latter. There are two tests to determine whether this is so: (1) if all of the elements of the lesser offense are included in the elements of the greater offense, or (2) if the allegations of the pleading describe the charged offense so that it necessarily includes all the elements of the lesser offense. (*People v. Lopez* (1998) 19 Cal.4th 282, 288–289 [79 Cal.Rptr.2d 195, 965 P.2d 713].)

Here, the amended complaint pleaded count 1 as "murder [of] a human fetus." However, in a subsequent version of the amended complaint, which was deemed an information, and which constituted the operative pleading in this case, the count was amended to read "murder [of] a human being."

■ Under the elements test, "if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former. [Citations.]" (*People v. Lopez, supra,* 19 Cal.4th 282, 288.) The crime of murder of a human being does not include as an element the murder of a fetus, because human beings are murdered all the time without any involvement of a fetus. Thus, applying the elements test, the attempted murder of a fetus is not a lesser included offense to murder of a human being. (Cf. *Id.* at pp. 288–289.)

Nor did the operative pleading make murder of a fetus a lesser included offense. Because defendant was ultimately charged specifically with murder of a human being, without mention of a fetus, attempted murder of a fetus was not a lesser included offense under the pleadings test. Accordingly, defendant was not entitled to instruction on attempted murder of a fetus as a lesser included offense. The trial court did not err by failing to give such an instruction sua sponte.

■ In his reply brief, defendant asserts for the first time that if attempted murder of a fetus was not a lesser included offense under the operative pleading, then he was entitled to an instruction on attempted murder *of a human being* as a lesser included offense. It is improper to raise new contentions in the reply brief. (*Neighbours v. Buzz Oates Enterprises* (1990)

217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].)[8] Therefore, this contention is forfeited. ·

█ In any event, defendant does not cite any authority holding that attempted murder is a lesser included offense to murder, but merely asserts this proposition. A legal proposition asserted without apposite authority necessarily fails. (*Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 [23 Cal.Rptr.2d 73].)

But even assuming that attempted murder of a human being was a lesser included offense to murder as pleaded here, and even assuming an instruction on attempted murder of a human being should have been given, any error in failing so to instruct was harmless: in light of the entire cause, including the evidence, it is not reasonably probable that defendant would have obtained a more favorable outcome had the instruction been given. (*People v. Breverman, supra,* 19 Cal.4th at p. 178.) His conduct was brutal, and the words he spoke as he repeatedly punched Garvon White in the stomach—"I don't want this bitch to have my baby"—made clear his intent to kill the fetus she was carrying. On these facts a reasonable jury could not have found that his crime was merely one of attempt.

VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VIII

█ Defendant contends the jury's finding as to count 2 that he terminated White's pregnancy is not supported by the evidence, because as a matter of law "termination of . . . pregnancy" as used in section 12022.9, former subdivision (a), can only mean a miscarriage or an abortion.[10] We conclude he has not supported this contention.

---

[8] Moreover, defendant's method of raising the argument is confusing. Below an argument heading which speaks only of attempted murder of a fetus, he makes his new contention under the subheading "Attempted Murder Is A Lesser Included Offense To Murder." This does not comply with California Rules of Court, rule 14(a)(1)(B), which requires an appellate brief to "state each point under a separate heading or subheading summarizing the point": defendant's subheading is not logically related to his overall heading and does not "summariz[e] the point" that instruction on attempted murder of a human being as a lesser included offense to murder was required.

*See footnote, *ante,* page 628.

[10] Section 12022.9, former subdivision (a), in effect at the time of trial, provided: "Any person who, during the commission or attempted commission of a felony, knows or reasonably should know that the victim is pregnant, and who, with intent to inflict injury, and without the consent of the woman, personally inflicts injury upon a pregnant woman that results in the termination of the pregnancy shall, in addition and consecutive to the punishment prescribed by the felony or attempted felony of which the person has been convicted, be punished by an additional term of five years in the state prison. The additional term provided in this subdivision shall not be imposed unless the fact of that injury is charged in the accusatory

" ' "We begin with the fundamental rule that our primary task in construing a statute is to determine the Legislature's intent. [Citation.]" [Citation.] " 'The court turns first to the words themselves for the answer.' [Citations.]" [Citation.] When the statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citation.] The plain language of the statute establishes what was intended by the Legislature. [Citation.]' [Citation.]" (*People v. Statum* (2002) 28 Cal.4th 682, 689–690 [122 Cal.Rptr.2d 572, 50 P.3d 355].)

The plain meaning of former section 12022.9 does not limit its application to cases of miscarriage or abortion. Moreover, defendant cites no authority so limiting the term "termination of pregnancy" in section 12022.9. Instead, he offers definitions of the term in unrelated statutes and case law, plus what he calls "an examination of probable legislative intent" devoid of any actual indicia of such intent. He also asserts that his preferred definition accords with the clear and unambiguous meaning of the term in ordinary usage, but again fails to provide any relevant authority for this claim—not even a dictionary definition. Legal contentions unsupported by apposite authority are waived. (*Amato v. Mercury Casualty Co., supra,* 18 Cal.App.4th 1784, 1794.)

In *Dennis, supra,* 17 Cal.4th 468, the only published case thus far to address section 12022.9, the court noted: "As an enhancement, section 12022.9 does not represent an alternative to a charge of fetal murder in violation of section 187. Instead, it imposes an additional punishment for committing, or attempting to commit, a felony in a manner that intentionally injures a pregnant woman and results in termination of her pregnancy. *The enhancement relates to the particular injury a defendant inflicts on a woman in committing the substantive crime.*" (*Dennis, supra,* 17 Cal.4th at p. 501; italics added.) Although *Dennis* does not discuss the precise issue before us now, its reasoning is instructive.

*Dennis, supra,* 17 Cal.4th 468, teaches that the point of the enhancement is to punish the defendant for injuring a woman in a particular manner with a particular result, not for the particular harm that comes to the fetus she is carrying. Given this logic, the enhancement is properly imposed when the pregnancy "terminates"—i.e., ends—in any manner as a result of the defendant's intentional felonious act. If only a miscarriage or an abortion could

pleading and admitted or found to be true by the trier of fact. [¶] Nothing in this subdivision shall be construed as affecting the applicability of subdivision (a) of Section 187 of the Penal Code."

The statute was later amended to delete former subdivision (b) and renumbered without subdivisions, but not materially changed. (Stats. 2002, ch. 126, § 7.)

constitute the "termination" of a pregnancy under this statute, the Legislature could have so specified. Here, defendant's assault on Garvon White ended her ongoing pregnancy two months prematurely by forcing the immediate delivery of her fetus through a C-section. Under the logic of *Dennis,* and applying the plain language of the statute, we conclude that the enhancement was supported by the evidence.

IX*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

X

In a supplemental brief, defendant contends the trial court erred in sentencing by denying him presentence custody credit pursuant to section 2933.2. The People concede the point. We accept the People's concession.

It is undisputed that defendant served 390 days in jail from the date of his arrest to the date of sentencing, and his arrest was for the offense that led to his conviction; therefore he was presumably entitled to 390 days of custody credit pursuant to section 2900.5, subdivision (a), which provides in part: "In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail . . . , all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment."

The probation officer informed the trial court, however, that under section 2933.2 defendant's murder conviction made him ineligible for custody credit. The trial court stated in pronouncing judgment: "Pursuant to 2933.2 of the Penal Code, no credit for time served will be awarded at this time." The abstract of judgment does not show any award of custody credit.

Section 2933.2 provides in part:

"(a) Notwithstanding Section 2933.1 or any other law, any person who is convicted of murder, as defined in Section 187, *shall not accrue any credit, as specified in Section 2933.*

"[¶] . . . [¶]

"(c) Notwithstanding Section 4019 or any other provision of law, no credit *pursuant to Section 4019* may be earned against a period of confinement in,

---

*See footnote, *ante,* page 628.

or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest for any person specified in subdivision (a)." (Italics added.)

█ Neither section 2933 nor section 4019 concerns custody credit for presentence jail time, however. Section 2933 addresses only worktime credit accrued in prison after conviction.[11] Section 4019 addresses only worktime and conduct credit accrued between arrest and conviction, not custody credit.

---

[11] Section 2933 provides: "(a) It is the intent of the Legislature that persons convicted of a crime and sentenced to the state prison under Section 1170 serve the entire sentence imposed by the court, except for a reduction in the time served in the custody of the Director of Corrections for performance in work, training or education programs established by the Director of Corrections. *Worktime credits shall apply for performance in work assignments and performance in elementary, high school, or vocational education programs.* Enrollment in a two- or four-year college program leading to a degree shall result in the application of time credits equal to that provided in Section 2931. For every six months of full-time performance in a credit qualifying program, as designated by the director, a prisoner shall be awarded worktime credit reductions from his or her term of confinement of six months. A lesser amount of credit based on this ratio shall be awarded for any lesser period of continuous performance. Less than maximum credit should be awarded pursuant to regulations adopted by the director for prisoners not assigned to a full-time credit qualifying program. Every prisoner who refuses to accept a full-time credit qualifying assignment or who is denied the opportunity to earn worktime credits pursuant to subdivision (a) of Section 2932 shall be awarded no worktime credit reduction. Every prisoner who voluntarily accepts a half- time credit qualifying assignment in lieu of a full-time assignment shall be awarded worktime credit reductions from his or her term of confinement of three months for each six-month period of continued performance. Except as provided in subdivision (a) of Section 2932, every prisoner willing to participate in a full-time credit qualifying assignment but who is either not assigned to a full-time assignment or is assigned to a program for less than full time, shall receive no less credit than is provided under Section 2931. Under no circumstances shall any prisoner receive more than six months' credit reduction for any six-month period under this section.

"(b) Worktime credit is a privilege, not a right. Worktime credit must be earned and may be forfeited pursuant to the provisions of Section 2932. . . . Except as provided in subdivision (a) of Section 2932, every prisoner shall have a reasonable opportunity to participate in a full-time credit qualifying assignment in a manner consistent with institutional security and available resources.

"(c) Under regulations adopted by the Department of Corrections, which shall require a period of not more than one year free of disciplinary infractions, worktime credit which has been previously forfeited may be restored by the director. The regulations shall provide for separate classifications of serious disciplinary infractions as they relate to restoration of credits, the time period required before forfeited credits or a portion thereof may be restored, and the percentage of forfeited credits that may be restored for these time periods. For credits forfeited for commission of a felony specified in paragraph (1) of subdivision (a) of Section 2932, the Department of Corrections may provide that up to 180 days of lost credit shall not be restored and up to 90 days of credit shall not be restored for a forfeiture resulting from conspiracy or attempts to commit one of those acts. No credits may be restored if they were forfeited for a serious disciplinary infraction in which the victim died or was permanently disabled. Upon application of the prisoner and following completion of the required time period free of disciplinary offenses, forfeited credits eligible for restoration under the regulations for disciplinary offenses other than serious disciplinary infractions punishable by a credit loss of more than 90 days shall be restored unless, at a hearing, it is found that the prisoner refused to

(§ 4019, subds. (b), (c).)[12] Therefore defendant was entitled to presentence custody credit pursuant to section 2900.5, and the trial court erred by denying defendant custody credit in reliance on section 2933.2. (See *People v. McNamee* (2002) 96 Cal.App.4th 66, 74 [116 Cal.Rptr.2d 625].)

■ A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. (*People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8 [55 Cal.Rptr.2d 675].) We shall award defendant 390 days of presentence custody credit and shall direct the trial court to prepare a corrected abstract of judgment showing this award.

## DISPOSITION

The judgment is affirmed. Defendant is awarded 390 days of presentence custody credit (Pen. Code, § 2900.5). The trial court is directed to prepare a corrected abstract of judgment showing the award of custody credit and to forward a certified copy to the Department of Corrections.

Raye, J., and Hull, J., concurred.

A petition for a rehearing was denied July 15, 2004, and appellant's petition for review by the Supreme Court was denied September 29, 2004. George, C. J., did not participate therein.

---

accept or failed to perform in a credit qualifying assignment, or extraordinary circumstances are present that require that credits not be restored. 'Extraordinary circumstances' shall be defined in the regulations adopted by the director. However, in any case in which worktime credit was forfeited for a serious disciplinary infraction punishable by a credit loss of more than 90 days, restoration of credit shall be at the discretion of the director.

"The prisoner may appeal the finding through the Department of Corrections review procedure, which shall include a review by an individual independent of the institution who has supervisorial authority over the institution.

"(d) The provisions of subdivision (c) shall also apply in cases of credit forfeited under Section 2931 for offenses and serious disciplinary infractions occurring on or after January 1, 1983."

[12] Section 4019, subdivisions (b) and (c) provide: "(b) Subject to the provisions of subdivision (d), for each six-day period in which a prisoner is confined in or committed to a facility as specified in this section, one day shall be deducted from his or her period of confinement unless it appears by the record that the prisoner has refused to satisfactorily perform labor as assigned by the sheriff, chief of police, or superintendent of an industrial farm or road camp.

"(c) For each six-day period in which a prisoner is confined in or committed to a facility as specified in this section, one day shall be deducted from his or her period of confinement unless it appears by the record that the prisoner has not satisfactorily complied with the reasonable rules and regulations established by the sheriff, chief of police, or superintendent of an industrial farm or road camp."