Filed 5/8/14  P. v. Reyes CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B246621 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA119708) |
| v. | |
| RAFAEL REYES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Pat Connolly, Judge.  Affirmed as modified.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Brendan Sullivan, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant and appellant Rafael Reyes of second degree murder (Pen. Code, § 187, subd. (a)[1]) and found true the allegations that defendant personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)).  The trial court sentenced defendant to 40 years to life in state prison, and awarded him 522 days of actual custody credit.  On appeal, defendant contends that insufficient evidence supports his second degree murder conviction, the trial court miscalculated his actual custody credit, the minute order for his sentencing hearing and the abstract of judgment incorrectly reflect the trial court's award of actual custody credit, and the abstract of judgment incorrectly reflects his sentence for violating section 12022.53, subdivision (d).  We order the minute order for defendant's sentencing hearing and the abstract of judgment modified to reflect 524 days of actual custody credit and zero days of conduct credit and the abstract of judgment modified to reflect a sentence of 25 years to life for defendant's violation of section 12022.53, subdivision (d).  The judgment otherwise is affirmed.

# BACKGROUND

About 1:00 a.m. on August 26, 2011, Nicholas Jaramillo, defendant, and Walter Velasco drove to a house at the corner of 87th Place and Wall to obtain marijuana.[2] Jaramillo testified that he had been to that location to obtain marijuana twice before with Velasco and once with defendant.  Velasco drove, defendant was seated in the front passenger seat, and Jaramillo sat in the back seat behind defendant.

---

[1]    All statutory citations are to the Penal Code.

[2]    Jaramillo testified under a grant of immunity that concerned his attempt to purchase narcotics and did not concern his participation in a murder or shooting.  He admitted a 2008 conviction for assault with a deadly weapon and a 2012 conviction for auto theft.

Los Angeles Police Department Detective Joseph Kirby testified that the house at the corner of 87th Place and Wall was a place where crack cocaine was sold. The house used a "hook" in its transactions—i.e., a person who loitered around the premises and made contact with persons in the area whom the hook believed were present to purchase crack cocaine. The hook would advise a potential buyer of the next steps in the transaction process.

As they arrived at the house, Jaramillo saw two Black men standing outside. Jaramillo believed that the men were looking for people who wanted to buy narcotics. According to Jaramillo, Velasco parked across the street from the house. Defendant got out of the car and crossed the street to see if there were any drugs. After a while, Jaramillo heard two gunshots and saw one of the two Black men who had been standing in front of the house run about 20 feet before falling to the sidewalk.

After the gunshots, defendant got back in the car. Realizing that one of the Black men he had seen had been shot, Jaramillo felt shock and disbelief. He looked at Velasco whose face appeared to convey shock and disbelief. Velasco began to drive toward the freeway, but Jaramillo convinced him to return because he believed that it was not right that a man had been shot and they did not check on him. Velasco parked at the corner, down the street from "where it happened." Defendant and Velasco got out of the car, and Jaramillo moved to the driver's seat. The police arrived shortly thereafter and before he could "do anything."

About 1:00 a.m. on August 26, 2011, Officer Sean Dempsey and other officers responded to a shooting call at 87th Street and Wall Street. Nearby, at 87th Place and Wall Street, the officers found Richard Lewis lying on the sidewalk. Lewis had sustained two gunshot wounds and was unconscious and not breathing. Officer Dempsey called for an ambulance. Lewis died from a gunshot wound that perforated his lungs, trachea, and aorta. Two bullets were recovered from Lewis's body during the autopsy.

At the scene, Officer James Grace contacted a person who pointed west and said, "They went that way." The person gave a brief description of a vehicle. Officer Grace drove west and observed a vehicle—a silver or light gold four-door Nissan Altima—that

3

matched the witness's vehicle description. The Altima was parked on the north side of the street and was facing west. A person was sitting in the driver's seat. Defendant's fingerprints were found on an open beer bottle in the Altima.

Officer Kurt Lockwood and his partner were near the scene of the shooting call. Officer Lockwood saw two Hispanic males—defendant and Velasco—running into a restaurant parking lot from the direction of the shooting call. Officer Lockwood and his partner conducted a pedestrian stop. Officer Lockwood visually inspected the men for weapons and determined that they were not armed. Officer Lockwood had not received a description of the persons suspected of being involved in the shooting and allowed defendant and Velasco to leave. Subsequently, Officer Ramon Barunda and his partner detained defendant and Velasco.

Officer Noel Sanchez found a .22 caliber Jennings handgun on the sidewalk on Main Street just south of Manchester. The police found two spent .22 caliber cartridge casings on the ground in the area of 87th Place. A criminalist determined that the two cartridge casings found at the scene and one of the bullets recovered from Lewis's body by the coroner had been fired from the .22 caliber Jennings handgun.

Detective Kirby did not direct anyone to take gunshot primer samples from defendant, Velasco, or Jaramillo. In Detective Kirby's experience tests for gunshot residue were not very reliable.

Later that morning, Detective Kirby and another detective interviewed Jaramillo. Because he was afraid, and did not want to put Velasco at the scene, or "snitch" on defendant, Jaramillo initially denied any knowledge of what had happened. Jaramillo testified that he did not see defendant shoot the Black man. He testified at the preliminary hearing that he told Detective Kirby that defendant began shooting the victim with a handgun from a distance of approximately four to five feet and that Velasco was in the car at the time of the shooting. According to Jaramillo, his preliminary hearing testimony was truthful. Jaramillo testified that he "told the detective, per [his] testimony, that defendant . . . shot and killed that African American man." He denied that he had blamed defendant to protect Velasco from responsibility for the shooting.

4

On cross-examination, Jaramillo acknowledged that he testified at the preliminary hearing that he did not see defendant shoot anybody. When asked to explain the inconsistency in his preliminary hearing testimony, Jaramillo stated, "I never seen him shoot anybody." Further on cross-examination, Jaramillo admitted that he went to the house at 87th Place and Wall to purchase rock cocaine and not to purchase marijuana as he had earlier told the police several times and as he had testified at the preliminary hearing and at trial. Jaramillo also admitted that, as he told Detective Kirby, he had been to the drug house 10 times and not two times as he testified. He also admitted that he had gone with Velasco to the drug house 10 times, but he had never gone with defendant.

Jaramillo testified that initially he gave the police a version of the events in which he was on 87th Street near Main, he did not hear any shots, he did not know that a murder had been committed, and he had been sitting in the driver's seat of the car drinking a beer. The police told him that if he stuck to that story he would be booked for murder. Asked if he believed that if he changed his story he would be released, Jaramillo responded, "Well, I thought about it, and my best chances were to say the truth." Jaramillo was never booked for murder and was released shortly after he changed his story. Jaramillo affirmed on cross-examination that it was his testimony that defendant was the shooter.

Detective Joseph Kirby testified about his interview with Velasco.[3] Velasco told the detective that he drove to the area of 87th Street between Main and Wall to buy rock cocaine. He and defendant got out of the car and approached a house to buy rock cocaine.

Detective Kirby also testified about a video that was played for the jury that showed defendant in custody in the holding tank at the Southeast Station at 3:00 a.m. on August 26, 2011. The holding tank had a window and a door. On the outside of the window was the watch commander, the person in charge of all of the activities at the Southeast Station. The holding tank did not have a toilet or urinal. If a person needed to

---

[3] Velasco asserted his 5th Amendment right to remain silent, and the trial court deemed him unavailable to testify.

5

use the bathroom, he had to notify the watch commander verbally, or by knocking on the holding tank's window.  The video showed defendant look out the holding tank's window then approach and urinate on his leather jacket which was in the corner of the holding tank.  Defendant then turned over his jacket and urinated on the other side.  Although the video did not show a stream of urine, Detective Kirby testified that he determined that defendant was urinating on his jacket by the way defendant stood, defendant's motions, and visible pooling urine.  Detective Kirby testified that there was a "popular perception" that urine removes gunshot residue from hands or clothes.

The police took DNA swabs from defendant, Velasco, and Jaramillo.  Those swabs were compared to a DNA swab taken from the .22 caliber Jennings handgun.  A criminalist determined that the swab from the handgun contained a mixture of DNA from more than three people.  Because there was a mixture of DNA, the criminalist could not conclude that the DNA came from any particular person.  The criminalist could, however, determine the probability that a person's DNA was included within the mixture.  According to the criminalist, the "combined probability of inclusion" that defendant's DNA fit within the profile of the DNA mixture found on the handgun was one in 8,200.  The criminalist explained that under that combined probability of inclusion, if 8,200 people were selected at random, it was probable that one person's DNA would fit within the DNA mixture found on the handgun.  With respect to Velasco's DNA, the combined probability of inclusion that his DNA was part of the mixture was one in 1,400.  The combined probabilities of inclusion for defendant and Velasco differed because the criminalist looked at 15 locations for defendant and only 14 for Velasco.  The information was insufficient to include or exclude Jaramillo's DNA.

### DISCUSSION

I.     **Sufficiency of Evidence in Support of Defendant's Murder Conviction**

Defendant contends that insufficient evidence supports his murder conviction because his conviction rests almost entirely on Jaramillo's testimony, which testimony was unreliable, defendant asserts, because Jaramillo used crack cocaine, was a friend of

6

another suspect in the shooting (Velasco), and lied repeatedly when testifying. Sufficient evidence supports the conviction.

### A.    *Standard of Review*

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.]" (*People v. Zamudio, supra,* 43 Cal.4th at pp. 357-358.) In determining whether substantial evidence supports a conviction, "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses." (*People v. Little* (2004) 115 Cal.App.4th 766, 771, citing *People v. Jones* (1990) 51 Cal.3d 294, 314.)

### B.    *Application of Relevant Principles*

Defendant argues that insufficient evidence supports his murder conviction because his conviction depends almost entirely on Jaramillo's "unreliable" testimony. He contends that "[t]he only evidence that [he], and not Velasco, shot Lewis came from Jaramillo, a twice convicted felon, whose testimony was too unreliable to support the

conviction." Defendant chronicles various asserted lies and contradictions in Jaramillo's testimony and offers an interpretation of the evidence that does not implicate defendant as the shooter. Because "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses" in determining whether substantial evidence supports a conviction, defendant's argument fails. (*People v. Little, supra,* 115 Cal.App.4th at p. 771, citing *People v. Jones, supra,* 51 Cal.3d at p. 314.)

Moreover, sufficient evidence independent of Jaramillo's testimony supports defendant's conviction. The two cartridge casings found at the scene and one of the bullets recovered from Lewis's body by the coroner were fired from the .22 caliber Jennings handgun. Although the criminalist could not conclude that the DNA found on the .22 caliber Jennings handgun came from any particular person because there was a mixture of DNA on the handgun, the "combined probability of inclusion" that defendant's DNA fit within the profile of the DNA mixture found on the handgun was one in 8,200. That is, if 8,200 people were selected at random, it was probable that only one person's DNA would fit the profile of the DNA mixture found on the handgun. A witness provided officers with a description of the vehicle involved in the shooting—the Altima. Defendant's fingerprints were found on an object in the Altima. Also, Officer Kirby testified that there was a popular perception that urine removes gunshot residue from clothes. A video showed defendant urinating on his leather jacket just two hours after the shooting while in the jail's holding tank.

## II.    Defendant's Award of Actual Custody Credit

Defendant contends that the trial court erred in awarding him 522 days of actual custody credit rather than 524 days. He further contends that the minute order for his sentencing hearing and the abstract of judgment incorrectly reflect that the trial court's award of 522 days of credit consisted of 365 days of actual custody credit and 157 days of conduct credit rather than 522 days of actual custody credit only. Respondent agrees as do we.

8

The trial court awarded defendant 522 days of actual custody credit. The trial court's award did not consist of 365 days of actual custody credit and 157 days of conduct credit as reflected in the minute order for defendant's sentencing hearing and the abstract of judgment.[4]

Under section 2900.5, a defendant convicted of murder is entitled to credit for actual days spent in custody from the date of arrest to the date of sentencing. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 645.) Defendant was arrested on August 26, 2011, and sentenced on January 30, 2013, a period of 524 days. Accordingly, defendant was entitled to an award of 524 days of actual custody credit and the trial court erred in awarding him 522 days.

The trial court's oral pronouncement of sentence prevails over the minutes and the abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186; *People v. Mesa* (1975) 14 Cal.3d 466, 471; *People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3.) Thus, generally, we would order the minute order and abstract of judgment modified to reflect the trial court's oral award of 522 days of actual custody credit. As explained above, however, the trial court's oral award of 522 days was error. Accordingly, we order the minute order for defendant's sentencing hearing and the abstract of judgment modified to reflect an award of actual custody credit of 524 days—the correct calculation—as opposed to 522 days—the incorrect calculation, and zero days of conduct credit.

## III. Defendant's Section 12022.53, Subdivision (d) Sentence

The trial court imposed a 25 years to life sentence for defendant's violation of section 12022.53, subdivision (d). The abstract of judgment reflects only a sentence of 25 years—i.e., it fails to reflect the sentence's indeterminate life component. Defendant

---

**4** The trial court properly did not award defendant presentence conduct credit as persons convicted of murder are not entitled to such credit. (§ 2933.2, subds. (a) & (c); *People v. Calles* (2012) 209 Cal.App.4th 1200, 1226.)

contends that the abstract of judgment must be modified to reflect a term of 25 years to life. Again, respondent and we agree.

When a defendant has been found to have violated section 12022.53, subdivision (d), a sentence of 25 years to life is mandatory. (*People v. Kim* (2011) 193 Cal.App.4th 1355, 1362-1363.) The trial court properly imposed a 25 years to life sentence for defendant's violation of section 12022.53, subdivision (d). The improper 25 years sentence in the abstract of judgment thus was a clerical error. Accordingly, we order the abstract of judgment modified to reflect a sentence of 25 years to life for defendant's violation of section 12022.53, subdivision (d). (*People v. Mitchell, supra,* 26 Cal.4th at p. 185.)

## DISPOSITION

The minute order for defendant's sentencing hearing and the abstract of judgment are ordered modified to reflect 524 days of actual custody credit and zero days of conduct credit and the abstract of judgment is ordered modified to reflect that defendant was sentenced to 25 years to life for his violation of section 12022.53, subdivision (d). The judgment otherwise is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P. J.


KRIEGLER, J.

10