Filed 10/20/15  P. v. Leach CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C075967 |
| Plaintiff and Respondent, | (Super. Ct. No. LF012885A) |
| v. | |
| CHRISTINE ALBERTA LEACH, | |
| Defendant and Appellant. | |

Suffering from severe delusions, defendant Christine Alberta Leach drove her car, with her young daughter inside, directly into a passing train.  A jury found her guilty of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664/187)[1] and child endangerment (§ 273a, subd. (a)).  In the second phase of the trial, the jury found defendant not guilty by reason of insanity.  (§ 1026.)  The trial court ordered defendant

---

[1] Further undesignated statutory references are to the Penal Code.

committed to a state hospital for a maximum confinement of life with 676 days of custody credit.

On appeal, defendant challenges only the guilt phase of the trial. She contends there was insufficient evidence of an intent to kill to support the attempted murder conviction, and insufficient evidence that the attempt was willful, deliberate, and premeditated. Further, she contends she is entitled to 203 additional days of custody credit. The People concede the last point and we accept the concession. We find sufficient evidence to support the verdict and affirm the commitment order as modified to increase the custody credit.

## FACTS

*The Collision*

At about 1:50 p.m. on October 7, 2011, a number of cars were stopped on Pine Street in Lodi waiting for a train to pass. The crossing arm was down and the warning lights were flashing. Suddenly, a white car driven by defendant with her young daughter inside pulled out from the line of cars, accelerated to 40 miles per hour, and drove straight into the side of the moving train. The car was dragged and then spun around as if the train "spit it out."

Defendant collided with the 42nd of 64 train cars. The train was going about 45 miles per hour and the locomotive engineer was unaware of the collision.

Several of those waiting at the railroad crossing got out to help defendant and her daughter. Defendant walked around in a daze. She did not say anything. The child had cuts and bruises and complained her stomach hurt. When medical personnel arrived, defendant told them to leave her daughter alone; her daughter was fine. Police officers arrested her.

The police took defendant to the emergency room where she refused to cooperate. She said she did not understand why bad men were chasing her. She said she thought people were following her through town. She stopped for the train, but then tried to get

2

away from the bad people. She did not mean to hurt anyone. When defendant was transported to the jail that night she appeared somber and sedated. She spontaneously told the officer: " 'Officer, please try to save my daughter's life if you can. I don't want to put you in a bad spot.' " " 'Can you just pray, pray that evil does not get her.' " " 'You know, I tried, I tried to live God's plan and not take our lives, but I just couldn't do it. I knew something bad would happen if I didn't live his plan.' "

The child was hospitalized for three days and monitored for a pulmonary contusion (bruise on the lung) and a swollen colon. Her only external injury was a "seatbelt sign," running from her left neck to the lower right quadrant of her abdomen.

*Defendant's Actions Before Collision*

Defendant's older daughter, who was 21 at the time of the trial, lived with her father and saw her mother about six days before the collision. Defendant was emotional and crying a lot. She was acting strange and said she had something to tell her daughter, but was afraid to because it would change her daughter's life. Defendant told her older daughter she was going someplace far away soon; if something happened to her, there would be a note in the silverware drawer. Defendant said her younger daughter would be with her. Defendant was acting paranoid and said people were following her. Defendant had never hurt either of her daughters and did not say anything about hurting herself or her younger daughter. After the collision with the train, the older daughter went to defendant's apartment and found it in shambles and torn apart. There was no note in the silverware drawer.

The night before the incident defendant and her young daughter went to a friend's. Defendant was crying and told her daughter they were now safe. Defendant told her friend the carpet layers were harassing her and her apartment stank from the carpet. She also said ninjas were chasing them. The next morning (the morning of the collision) defendant and her daughter were gone and the door was wide open. Their coats and

3

shoes were left behind. There were sticks and stones, which the friend described as "a lucky witchcraft thing," in the pocket of defendant's coat.

Defendant called the police early that same morning, reporting someone was hiding under her boiler. The dispatcher noted the situation was a possible 5150.[2] The dispatcher told defendant to go home; instead, she went to the police station. A police officer found defendant and her daughter, with no shoes on, outside the police station. Defendant was upset and said there was a man under her heater. A police officer went to defendant's apartment to make sure no one was inside. Defendant was upset about the carpet and asked if light coming through the windows to the walls could be ghosts.

Later that morning, defendant drove up to a television cameraman loading his equipment into his car. She said she needed help because people were following her. She looked paranoid and nervous. He told defendant to call the police. She said she was driving around trying to evade those following her.

About 10:30 a.m. that same day, defendant and her daughter went into a cheese shop in downtown Lodi. The child was happy, but defendant was nervous and paced. The child said they had no home to go to because someone had taken all their things. Defendant said, " 'We're due in heaven in a couple of days.' "

Around lunch time, defendant went into a bank and asked them to call the National Guard because someone was following her. The bank employee called the police and gave the phone to defendant. The police told defendant to come to the station; she did not. Defendant was angry that no one would help her. Shortly after lunch defendant drove her car into the train.

---

[2] Welfare and Institutions Code section 5150 provides for taking a person into custody for 72 hours for evaluation and treatment when such person, as a result of a mental health disorder, is a danger to herself or others or is gravely disabled.

*Defendant's Mental Condition*

John Chellsen, Ph.D., a clinical psychologist, evaluated defendant at the court's request. His diagnosis was paranoid schizophrenia. On the date of the incident, defendant believed a former boyfriend, who was an alien from outer space, had put a band of static electricity around her head. She was scared and confused; she believed people were chasing her, and thought she could go through the train. In Dr. Chellsen's opinion, defendant was in acute psychosis at the time of the collision.

At the sanity phase of the trial, Dr. Chellsen opined that defendant was legally insane. She was incapable of appreciating and understanding both the nature and quality of her actions and their wrongfulness. A psychiatrist also testified defendant was legally insane. He opined she was able to understand the nature and quality of her act, but not the wrongfulness of the act.

## DISCUSSION

### I

*Sufficiency of the Evidence*

Defendant contends there is insufficient evidence she had the intent to kill required for attempted murder. She contends she was acting to protect her daughter, not to kill her. She also contends there is insufficient evidence the attempt was willful, premeditated, and deliberate. She argues she acted out of a rash panic rather than deliberation.

A. *Standard of Review*

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) In reviewing sufficiency of the evidence, we "presume in support of

5

the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Lewis* (1990) 50 Cal.3d 262, 277.) "[I]t is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding. [Citations.]" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

We will not reverse a conviction for insufficient evidence "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B. *Intent to Kill*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7.) Whether defendant had an intent to kill may be "derived from all the circumstances of the attempt, including the putative killer's actions and words." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.) Defendant's act of deliberately maneuvering her car around the line of cars waiting for the train to pass and then accelerating directly into the train with her young daughter in the car suggests an intent to kill, because her actions were likely to cause death to another person. (Cf. *People v. Smith* (2005) 37 Cal.4th 733, 742 [the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference of an intent to kill].) This suggestion is made manifest by defendant's words indicating she and her young daughter would soon die. She told her older daughter several days before the collision that she and the younger daughter were going far away and it would change the older daughter's life. She told the woman in the cheese shop that morning that they were due in heaven in a few days. Defendant expressed her intent to

take her own life and that of her daughter by telling the officer that she had tried to " 'live God's plan and not take our lives, but I couldn't do it.' "

Defendant contends her acute psychotic episode negated the intent to kill.

Under California law, if a defendant pleads not guilty and joins it with a plea of not guilty by reason of insanity, the issues of guilt and sanity are tried separately. In such circumstance, "the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed." (§ 1026, subd. (a).) Although the defense of diminished capacity has been abolished, diminished actuality survives, and "the jury may generally consider evidence of voluntary intoxication or mental condition in deciding whether defendant actually had the required mental states for the crime. [Citations.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.)

The jury was instructed on the diminished actuality defense and rejected it. "We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact. [Citation.]" (*People v. Baker* (2005) 126 Cal.App.4th 463, 469.) As we have found, substantial evidence supports the conviction for attempted murder.

C. *Willful, Deliberate, and Premeditated*

" 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

"Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, 'we require either very

7

strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citation.] But these categories of evidence, taken from *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

Substantial evidence supports the jury's finding that the attempted murder was willful, deliberate, and premeditated. From defendant's statements that she and her daughter were going away and due in heaven, as well as her statement to the officer that she had tried to refrain from taking her own life and her daughter's life but could not, the jury could conclude that she planned to kill her daughter and herself. While there was some evidence that defendant was trying to save her daughter from an imagined threat, in her severely delusional state defendant could have believed it was necessary to kill her daughter to save her; hence both mother and daughter were "due in heaven." The manner of the attempted killing shows deliberation. Defendant carefully maneuvered her car out of the line of cars so that she had a direct, unimpeded path to the passing train and accelerated directly into it.

## II

### *Additional Custody Credit*

Defendant contends, and the People agree, she is entitled to additional custody credit. We accept the People's concession and will modify her custody credits accordingly. (See *People v. Taylor* (2004) 119 Cal.App.4th 628, 647 [error in custody credit may be corrected whenever discovered].)

Defendant was arrested on October 7, 2011. She was sentenced on March 3, 2014. Defendant was in custody, either in jail or in a state hospital, for the entire time. She is entitled to custody credit for that entire period, which the parties agree is 879 days.

8

(§ 2900.5, subd. (a); *People v. Mord* (1988) 197 Cal.App.3d 1090, 1104.)  The custody credit is to be recorded on the abstract of judgment or the commitment order.  (§§ 2900.5, subd. (a), 1213.)

## DISPOSITION

The commitment order is modified to reflect 879 days of custody credit.  The superior court is directed to modify the commitment order accordingly and to send a copy of the modified commitment order to the State Department of State Hospitals.  As modified, the commitment order is affirmed.


                                      _____/s/_____
                                      DUARTE, J.


We concur:


_____/s/_____
HULL, Acting P. J.


_____/s/_____
BUTZ, J.