Filed 7/16/15  P. v. Lucero CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059553 |
| v. | (Super.Ct.No. INF10001969) |
| MARK ANTHONY LUCERO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard A. Erwood, Judge.  Affirmed with directions.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Mark Anthony Lucero was convicted of committing a lewd act upon a minor 14 years of age or younger (Pen. Code, § 288, subd. (a))[1] and sentenced to the midterm of six years in state prison. On appeal, he argues there was insufficient evidence to support the conviction and that his six-year sentence is cruel and unusual punishment. He also argues that the trial court erred in denying his motion for a new trial based on newly discovered evidence. Lastly, he asserts that the trial court failed to calculate his presentence custody credits. We agree that the trial court should have calculated defendant's presentence custody credits, but in all other respects, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      PROSECUTION'S CASE

The victim in this case was raised by her grandmother because her mother struggled with substance abuse. In the summer of 2010, the victim, then 12 years old, went to live with her mother in Palm Springs. Her mother lived in the same apartment complex as defendant, who was then 34 years old.

The victim testified that, one July day, she was playing Marco Polo in the complex's swimming pool with a group of kids. Defendant joined in the game and started throwing the kids across the pool. When he grabbed the victim, he held on to her and "didn't let go." He wrapped his arms around her "like a bear hug," put his head on her shoulder, and moaned in her ear. The victim felt uncomfortable. She told defendant

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

to stop and tried to push him away. Defendant hugged the victim a second time and again moaned in her ear.

The victim also testified that defendant touched her left breast and tried to remove her swimsuit. He pulled one of her swimsuit straps halfway down her arm, but she grabbed the strap and put it back on her shoulder. She again tried to push defendant away from her.

When she got out of the pool, defendant asked her to come back. He also asked her if she would go to the movies with him sometime and offered her his phone number. The victim did not want to go to the movies with defendant, and she told him that she would not put his number into her phone because he was a "grown-up."

A short while later, the victim returned to the pool area and noticed defendant appeared to be "pouting." Defendant told her that he was upset because she had called him a grown-up. When the victim got back into the pool, defendant began hugging her again.

Two women that were at the pool that day testified at trial. One woman testified that she saw defendant wrap his arms around the victim from behind, and that it made her feel uncomfortable. The other woman testified that the way defendant was putting his arms around the victim was unusual and that the victim appeared to be uncomfortable. She saw defendant put his arms around the victim four or five times, and each time the victim tried to move away from him. She also heard defendant ask the victim to the movies. She testified that defendant's behavior made her feel uncomfortable and that she had told her husband about the incident.

3

The nine-year-old daughter of defendant's then girlfriend was one of the children playing in the pool that day.[2] She testified that she saw defendant touch the victim's breasts in the pool.

A few days after the incident, the victim's mother called the police to report that defendant had inappropriately touched her daughter. The officer who interviewed the victim testified that she told him defendant had pulled her close to him, grabbed her by the waist, and moaned. The victim also stated that defendant had grabbed her left breast with his right hand and placed his left hand on her stomach. She said that she had pushed defendant away and asked him to stop each time he had touched her. She also reported that defendant had asked to take her to the movies and offered her his phone number.

The detective who interviewed defendant testified that defendant said he had picked the victim up by the waist and threw her in the pool. He also said that the victim had become upset when he told her he did not want to play Marco Polo anymore. Defendant told the detective that he had asked the victim to the movies and offered her his phone number because she was new to the apartment complex and he was trying to be friendly.

The victim's grandmother testified that the victim was "very unhappy" about having to live with her mother. She also testified that near the end of July 2010, the victim came back to live with her not because of the incident with defendant but because her mother had failed a Department of Child Protective Services (CPS) drug test.

---

[2] At the time of the incident, the witness was seven years old.

B.    DEFENSE'S CASE

Defendant denied touching the victim's breasts or moaning in her ear.  He also denied being sexually attracted to her.

The day of the incident was the first time defendant saw the victim.  He testified that he had been throwing his son, his girlfriend's daughter, and the victim across the pool as a game.  After a few hours, the victim got out of the pool and he asked her to come back in and play, but she refused.

Later, the victim returned to the pool area, dressed in jeans and walking her dog. She was holding a phone that she told defendant belonged to her and her mother. Defendant testified that he offered to give her his phone number for when she wanted to go to the movies or the park with him, his son, and his girlfriend's daughter.  Defendant thought it was "weird" when the victim responded, " 'You're a grown-up.  I'm not going to give you my number.' "

However, a short while later, the victim got back into the pool.  Defendant testified that she began splashing him playfully, but he told her he was too tired to play. The victim replied, " 'Fine.  Then don't touch me.' "  Defendant found her behavior "kind of odd."

A 17-year-old girl who lived at the apartment complex and was at the pool that day testified for the defense.  She saw defendant grab the victim from behind and throw her across the pool.  She also saw defendant touch the victim's breast, and noticed from the victim's "body language" that she was scared.  At first, she did not think this was an accident on defendant's part.  She explained that later when she thought back to the

5

incident, she hypothesized that it might have been an accident. She also heard defendant ask the victim to the movies and offer her his phone number. After the incident, the victim had told her that defendant "creeped her out" because he had inappropriately touched her.

The defense also called three character witnesses. Two of defendant's friends from Narcotics Anonymous testified that defendant sometimes babysat their children and that they trusted him. The manager of the apartment complex testified that she has a minor daughter who lived with her at the complex and that her daughter had never mentioned any strange behavior by defendant.

## DISCUSSION

A.    SUBSTANTIAL EVIDENCE SUPPORTS DEFENDANT'S CONVICTION

Defendant contends that the evidence was insufficient to prove that he touched the victim with the sexual intent necessary for a conviction under section 288, subdivision (a). We disagree.

"To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Jurado* (2006) 38 Cal.4th 72, 118.) All conflicts of evidence are resolved in favor of the judgment and all reasonable inferences are drawn in its favor. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) " ' " 'If the circumstances reasonably justify the trier of fact's

6

findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*People v. Burney* (2009) 47 Cal.4th 203, 253.)  In other words, reversal is unwarranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 329, quoting *People v. Bolin* (1998) 18 Cal.4th 297, 331.)

A conviction under section 288, subdivision (a) for lewd acts upon a child 14 years old or younger requires " 'any touching' " of the child with "the intent of arousing the sexual desires of either the perpetrator or the child." (*People v. Lopez* (2010) 185 Cal.App.4th 1220, 1229.)  The circumstances of the touching are " 'highly relevant' " to intent, and intent may even be inferred from those circumstances.  (*Ibid.*)  For example, "the nature of the touching, or the absence of an innocent explanation" can support a finding of lewd intent.  (*Ibid.*)

In *People v. Martinez* (1995) 11 Cal.4th 434, the court held that sexual intent could be inferred from the circumstances where the defendant forcibly hugged two 13-year-old girls, at separate times, "against his body until witnesses intervened." (*Id.* at p. 452.)  The court reasoned that "[b]ecause neither girl knew defendant and because he behaved in a predatory fashion," the defendant could have had "no purpose other than sexual gratification." (*Ibid.*)

7

Here, evidence in the record regarding the manner of the touching alone is sufficient to support a finding that defendant acted with a sexual intent. The jury heard testimony that defendant was essentially a stranger to the victim and that on one afternoon he forcibly hugged her, touched her breast, invited her to the movies, and tried to give her his phone number.

The victim testified that defendant repeatedly hugged her from behind while moaning, touched her breast, and tried to pull down her swimsuit strap, all while she was telling him to stop and trying to push him away. While the testimony of a single witness can be sufficient to support a conviction (*People v. Elliot* (2012) 53 Cal.4th 535, 585), here four eyewitnesses saw defendant inappropriately touch the victim.

Specifically, two women testified that the way defendant was hugging the victim made them feel "uncomfortable," and two other witnesses testified that they saw defendant touch the victim's breast. Additionally, one of the women observed that the victim kept moving defendant's hands away and that she "seemed uncomfortable." The 17-year-old witness testified that her first reaction to seeing the defendant touch the victim's breast was that it was not an accident.

In sum, the jury heard evidence from five witnesses that defendant had inappropriately touched the victim while she tried to push him away. This testimony, plus the testimony regarding the circumstances surrounding the touching, such as defendant's moaning, asking the victim to the movies, and offering her his phone number, reasonably support an inference that defendant touched the victim with a sexual intent. Like in *Martinez*, *supra*, the victim did not know defendant, and defendant acted

8

in a predatory manner by persisting in touching her despite her defenses. We therefore conclude that the jury could reasonably infer a sexual intent.

Defendant contends that the testimony of the eyewitnesses is unreliable. He asserts that the victim "provided inconsistent statements [about the incident] from the beginning" and that the women's testimony is unreliable because, despite claiming they were "uncomfortable," they did not intervene to stop defendant or call the police. Such arguments regarding witness credibility are unavailing under a substantial evidence review. Conflicts in testimony "and even testimony which is subject to justifiable suspicion" do not warrant reversal "for it is the exclusive province of the trial judge or jury to determine the credibility of a witness." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1016.) It is only where the evidence cannot be deemed as substantial under "[any] hypothesis whatever" that reversal of a conviction is warranted. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Here, there was ample testimony from the victim and the four other eyewitnesses, who testified defendant inappropriately touched the victim, to support the conviction. The fact there may have been inconsistencies in the victim's descriptions of the events in the many times she was called upon to revisit the incident is not only understandable but, more importantly, is inconsequential under a substantial evidence review.

Similarly inconsequential is defendant's argument that the testimony of the nine-year-old witness is unreliable because she had previously told an investigator and testified at an Evidence Code section 402 hearing that she did not remember what happened at the pool that day. Even if we accept defendant's assertion that the witness

did not recall the incident, the testimony provided by the victim, the two women, and the 17 year old is sufficient to constitute substantial evidence. Under a substantial evidence review, "the testimony of a single witness is sufficient to support a conviction," so long as that testimony is not inherently improbable or physically impossible. (See, e.g., *People v. Elliot*, *supra*, 53 Cal.4th at p. 585.)

Lastly, the fact that defendant supplied innocent explanations for touching the victim in the pool, asking her to the movies, and offering her his phone number, does not change our conclusion that substantial evidence supports the verdict. A defendant may have "offered explanations" for his alleged acts at trial "but the jurors did not have to believe them." (*People v. Dowl* (2013) 57 Cal.4th 1079, 1092.)

Defendant's conviction is supported by substantial evidence.

## B. THE TRIAL COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL

Defendant contends the trial court erred in denying his motion for new trial. We find there was no error because the evidence upon which defendant based his motion was immaterial impeachment evidence.

### 1. *PROCEDURAL BACKGROUND*

To rebut the claim that any touching had been sexual, at trial the defense presented the theory that the victim had embellished the incident because she did not like living with her mother and "just wanted to go [back] home to grandma's." At trial, both the victim and her grandmother testified that she did not want to move in with her mother. The victim's grandmother testified that the victim was "very unhappy" about having to

10

live with her mother but that she would "see what would happen and how things [went]." The grandmother denied that the incident with defendant was the catalyst for the victim returning to live with her. She explained that her daughter had recently failed one of CPS's drug tests and that CPS had asked her to take custody of her granddaughter.

A month before defendant's sentencing hearing, defense counsel obtained a release of CPS's records from the juvenile court. Defendant filed a motion for new trial based on statements by the victim and her grandmother contained in those records which, defendant argued, were "inconsistent" with the grandmother's trial testimony on the subject of the victim living with her mother.[3]

At the hearing on the motion, defense counsel stated he had recently learned of "impeachment evidence" in CPS's records. He argued there were statements by the victim and her grandmother in the records demonstrating that the victim maintained a strong desire to move back into her grandmother's house the entire time she lived with her mother. He also argued the records contained a declaration by the grandmother that indicated that the incident with defendant, not the positive drug test, was the reason why the victim moved back in with her. He concluded that if he had been in possession of this evidence at trial, the jury would have heard that the victim had a motive to exaggerate the incident with defendant, and the result would probably have been different.

---

[3] Defendant's motion for new trial also raised a juror misconduct claim, which was not raised on appeal.

The prosecutor argued that the sole value of the newly discovered evidence was to impeach the victim's grandmother. He also argued that there was no probability of a different result because several independent eyewitnesses had corroborated the victim's testimony about defendant's touching.

The court denied defendant's motion on the grounds that the evidence was solely for impeachment purposes and that "[t]here was substantial corroboration" of the victim's testimony regarding the incident itself. The court stated, "all of those statements in the CPS documents . . . they're impeaching one of the witnesses, but not about the fact of whether or not the event occurred, but whether or not the victim wanted to live with her mother or her grandmother." The court reasoned that in order to find that the new evidence would have affected the outcome of trial, it would have to "disregard the testimony of those witnesses [who corroborated the victim's testimony]." The court thus ruled that it was not reasonably probable that the trial result would have been different had defendant been in possession of the newly discovered evidence at trial.

2.     *ANALYSIS*

" ' " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " ' " (*People v. Howard* (2010) 51 Cal.4th 15, 42-43.) "A new trial motion based on newly discovered evidence is looked upon with disfavor." (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1151.)

It is well established that a new trial on the ground of newly discovered evidence is not granted where the only value of the testimony is as impeaching evidence or to contradict a witness of the opposing party. (See, e.g., *People v. Hall* (2010) 187 Cal.App.4th 282, 299; accord *People v. Green* (1982) 130 Cal.App.3d 1, 11; *People v. Moten* (1962) 207 Cal.App.2d 692, 698.) Moreover, a new trial is not warranted where it is not "probable" that the newly discovered evidence would have produced a different result. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

Here, there are at least two independent reasons why the trial court did not err in denying defendant's motion. First, the sole purpose of the newly discovered evidence was to impeach the grandmother's testimony about the *degree* to which the victim was opposed to living with her mother and about the reason why she ultimately went back to live with her grandmother. Defendant so concedes in his reply brief when he argues that the value of the new evidence is "that it reveals inconsistencies in testimony" and recognizes that impeachment evidence is not significant enough to make a different result probable for purposes of a motion for new trial. Defendant attempts to save his argument by asserting that this particular impeachment evidence is so powerful that it would have "seriously damage[d] the prosecution's case" Our ground for disagreeing with defendant is also our second reason why a new trial was not warranted.

Namely, it is not probable that the newly discovered evidence would have changed the outcome of the trial. This is because the jury heard testimony that the victim was "very unhappy" about having to move in with her mother and would have preferred to stay with her grandmother. Any additional evidence that the victim preferred to live at

13

her grandmother's house would have been cumulative and thus not an appropriate ground for a new trial. (*People v. Delgado*, *supra*, 5 Cal.4th at p. 328 [merely cumulative evidence is not a proper ground for new trial].) Moreover, the jury also heard, and presumably believed, the victim when she testified that she would not have embellished her account of the incident in an effort to move back to her grandmother's house. Even if the jury did not believe the victim on this account and was instead inclined to believe that she embellished her testimony, that testimony was corroborated by four other witnesses. In other words, the sole purpose of the new evidence was to damage the victim's credibility by offering a motive to exaggerate defendant's actions, but the victim's testimony about defendant's actions was corroborated by several other witnesses. We therefore conclude that the trial court did not err in denying defendant's motion for new trial.

C.     <u>DEFENDANT'S SIX-YEAR SENTENCE IS NOT CRUEL AND UNUSUAL PUNISHMENT</u>

Defendant contends that his six-year sentence constitutes cruel and unusual punishment under the federal and state constitutions. As a threshold matter, defendant forfeited this argument by failing to raise it with the trial court. (See, e.g., *People v. Norman* (2003) 109 Cal.App.4th 221, 229.) In any event, an analysis on the merits demonstrates that his sentence is not cruel and unusual punishment.

A punishment violates the federal Constitution if it is grossly disproportionate to the severity of the crime. (U.S. Const., 8th Amend.; *Graham v. Florida* (2010) 560 U.S. 48, 59-60.) Similarly, a punishment violates the California Constitution if " 'it is so

14

disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478.)  In determining whether a sentence is cruel and unusual, California courts: (1) review the nature of the offense or the offender; (2) measure the punishment at issue against punishments prescribed for more serious crimes in the jurisdiction; and (3) measure the punishment at issue against punishments prescribed for the same crime in other jurisdictions.  (*In re Lynch* (1972) 8 Cal.3d 410, 425-427.)

*Lynch* and *Dillon* merely provide guidelines for a cruel and unusual punishment analysis, and the importance of each prong depends on the facts of each case.  (See, e.g., *People v. Ayon* (1996) 46 Cal.App.4th 385, 398-399.)  "Determinations whether a punishment is cruel or unusual may be made based on the first prong alone," i.e., the nature of the offense.  (*Id.* at p. 399.)  Furthermore, "[t]he defendant has the burden of establishing that his punishment is greater than that imposed for more serious offenses in California and that similar offenses in other states do not carry punishments as severe." (*Ibid.*)

Defendant cannot meet that burden here.  Where, as in this case, a "defendant makes no effort to compare his sentence with more serious offenses in California or with punishments in other states for the same offense," the reviewing court may "take [that] as a concession that his sentence withstands a constitutional challenge on either basis." (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231.)  Putting aside defendant's failure to compare his sentence to others, our review of California cases involving sexual

15

molestation of minors reveals that sentences much greater than the one imposed in this case are not cruel and unusual.

For example, in *People v. Christensen* (2014) 229 Cal.App.4th 781, where the defendant was convicted of five counts of section 288, subdivision (a) violations, the court held that a cumulative sentence of 27 years (which included a 15-year sentence for one of the counts) was not cruel and unusual punishment under the federal and state constitutions. (*Id.* at pp. 803-809.) In reaching this conclusion, the court stated that "any one act" of lewd conduct upon a child under the age of 14 was a "serious offense" warranting a serious punishment. (*Id.* at p. 806; see also, e.g., *People v. Retanan*, *supra*, 154 Cal.App.4th at pp. 1222, 1230-1231 [cumulative sentence of 135 years, which included 15 years for each violation of section 288, subdivision (a), was not cruel and unusual punishment].)

We conclude that, based on the serious nature of the offense and the sentences imposed for convictions under section 288, subdivision (a) in California, a six-year sentence is not cruel and unusual punishment for committing a lewd act upon a 12-year-old child. Defendant's arguments regarding the other prongs of the *Lynch* and *Dillon* analysis, e.g., arguments relating to his lack of prior offenses, the characterization of his current offense as falling "on the light end of the abuse spectrum," his status as a father, his adherence to a Narcotic Anonymous program, and the plea deal the prosecution offered before trial, do not persuade us otherwise.

D.    DEFENDANT'S PRESENTENCE CREDITS

Defendant contends, and the People correctly concede, that the trial court erred in failing to calculate his presentence credits.  It is the duty of the sentencing court to calculate a criminal defendant's presentence credit.  (§ 2900.5, subds. (a) & (d); *People v. Buckhalter* (2001) 26 Cal.4th 20, 30.)  "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered."  (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)

At the sentencing hearing, the trial court directed the Department of Corrections to calculate defendant's presentence credits.  Additionally, the sentencing minute order and the abstract of judgment state that the Department of Corrections was to calculate defendant's presentence credits; the section for "credit for time served" on the abstract of judgment is blank.  Based on his presentence custody, defendant is entitled to a total of 149 days of credit, i.e., 130 days of actual custody credit[4] plus 19 days of conduct credit.[5]  Accordingly, the sentencing minute order and abstract of judgment should be modified to reflect that credit.

---

[4] Defendant spent 17 days in custody before he was released on bail (from July 27, 2010, to August 12, 2010), and then he spent 113 days in custody from remand to sentencing (from May 10, 2013, to August 30, 2013).

[5] Because defendant's conviction is considered a violent felony under section 667.5, his award of conduct credit is limited to 15 percent of his actual custody credit. (§ 2933.1, subds. (a) & (c); *People v. Sylvester* (1997) 58 Cal.App.4th 1493, 1495-1497.) Fifteen percent of 130 days is 19 days.

17

# DISPOSITION

The superior court is directed to award defendant 149 days of presentence credits, to amend its minute order and abstract of judgment, and to deliver a certified copy of the modified minute order and abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment of is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
P. J.

We concur:

McKINSTER_____
J.

MILLER_____
J.

18