Filed 4/25/22  P. v. Sanchez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ZACK SANCHEZ,<br><br>Defendant and Appellant. | F081586<br><br>(Super. Ct. No. BF179472A)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Franson, J. and Meehan, J.

Defendant Zack Sanchez stands convicted of assault on a peace officer with force likely to cause great bodily injury. On appeal, he contends (1) the evidence was insufficient to support a finding that the force used was likely to cause great bodily injury, (2) the trial court erred in denying his motion to suppress his statement pursuant to *Miranda*,[1] and (3) we should correct a clerical error in the sentencing minute order. The People disagree on the first two accounts, but agree that we should correct the clerical error. We order the clerical error corrected. In all other respects, we affirm.

## PROCEDURAL SUMMARY

On July 14, 2020,[2] the Kern County District Attorney filed an amended information charging defendant with assault on a peace officer with force likely to produce great bodily injury (Pen. Code, § 245, subd. (c);[3] count 1) and resisting an executive officer by use of threats or force (§ 69; count 2). As to counts 1 and 2, the amended information further alleged that defendant personally inflicted great bodily injury (§ 12022.7) and had suffered three prior "strike" convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and three prior serious felony convictions (§ 667, subd. (a)).

On July 21, the jury found defendant guilty on both counts, but found both allegations for infliction of great bodily injury to be not true. On the same date, in a bifurcated proceeding outside the presence of the jury, the trial court found all prior conviction allegations to be true.

On August 13, the trial court denied defendant's motion to strike his prior strike convictions (§ 1385; *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) and sentenced him as a third-strike offender to an aggregate term of 25 years to life as

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2]     All further dates refer to the year 2020 unless otherwise stated.

[3]     All further statutory references are to the Penal Code.

2.

follows: as to count 1, 25 years to life, plus a stayed five-year enhancement pursuant to section 667, subdivision (a); on count 2, 25 years to life, plus a five-year enhancement pursuant to section 667, subdivision (a), all stayed pursuant to section 654. The sentence on count 1 was imposed consecutive to the life without the possibility of parole sentence in case No. BF161033A.

On the same date, defendant filed a notice of appeal.

### FACTUAL SUMMARY

**The People's Case**

On December 22, 2019, Kern County Sheriff's Deputy Adrian Benavides worked as a deputy at the Kern County Central Receiving Facility—the jail nearest the courthouse in Bakersfield. When inmates move to different locations in the jail, they are required to follow white and yellow lines painted on the ground and move in a single-file line. At around noon, Benavides began escorting defendant and two other inmates from the visiting room on the ground floor to their housing unit on the second floor. Defendant was the second inmate in the line.

On the walk to the elevator that led to the second floor, the first inmate in line asked permission to get a newspaper that the jail provides to inmates. Inmates are required to ask permission before taking a newspaper. Benavides granted permission and the inmate collected a newspaper. Defendant also took a newspaper but did not ask permission to do so. Benavides "asked [defendant] if he asked [Benavides] for a newspaper." Defendant responded, "[I]f you want to be a b[***]h about it, I'll just put it back." He then returned the newspaper. As defendant returned the newspaper, Benavides walked toward him and asked, "[W]hat did you say to me?" Defendant then "took … a fighter stance," with the left side of his body closest to Benavides, balled his hands into fists, leaned back, and tensed his body. Benavides recognized those signs as indications of "pre-assaultive behavior." He took a "bladed stance" and attempted to place defendant into a control hold by grabbing his left hand. Defendant pulled away and

3.

Benavides tried to push him. Defendant punched Benavides in the jaw, causing him to lose consciousness.[4] Benavides sustained a cut on the right side of his forehead and a cut on the inside of his mouth, he had trouble hearing, his jaw felt misaligned, and he suffered pain on the inside of his mouth, on the left side of his face where defendant's punch landed, on the right side of his forehead, and in his jaw every time he ate for several weeks.

After defendant punched Benavides, Stillion directed defendant to lay on the ground. Defendant complied and Stillion handcuffed him. As he was handcuffing defendant, he said, "[C]ongratulations. You're going to stay a bit longer." Defendant responded, "I know. I don't care." Stillion then led defendant to the interview room.

A doctor from Kern Medical Center testified that Benavides was evaluated using a CT scan of his face and head. He testified that when there is an injury to the head, there is a concern about injury to the brain. Even when a CT scan shows no injury, a person who suffered head trauma may have a concussion. Concussion symptoms include fatigue, nausea, inability to concentrate, and being "groggy." In Benavides's case, the doctor noted swelling to the left side of his face. Benavides was evaluated at the hospital for just over an hour.

**The Defense Case**

Defendant testified that on December 22, 2019, he was an inmate. He had been convicted of felony offenses in 2016 and petty theft in 2015. At around noon on December 22, 2019, he had a visit with a friend and the friend's mother. After the visit concluded, Benavides told defendant and the other inmates in the visiting area to put their

---

**4** Although the video of the fight only displayed one punch, the frame rate of the video was poor. Kern County Sheriff's Deputy Michael Stillion, who was moving toward defendant and Benavides at the time of the fight, said that he observed two punches in rapid succession—a right-handed punch to Benavides's lower, left jaw and a left-handed punch that landed on the right, top portion of Benavides's forehead.

hands behind their backs and follow the white line to the elevator. Defendant did so. On the way to the elevator, the inmate in front of defendant asked for a newspaper and defendant did as well. Benavides told defendant that he could take a newspaper. Once defendant neared the elevator, Benavides said, "did I f[**]kin' tell you to get a paper?" Defendant said, "al[]right," and put the newspaper back. As defendant walked back to the elevator, Benavides had "walked up on [him]" and he seemed angry. He noted that Benavides was taller than him. Defendant was five feet four inches tall and weighed 185 pounds. When Benavides was about two or three feet away, defendant saw that Benavides "had his hand in a fist about to strike [defendant] and [defendant] defended himself" by punching Benavides with a closed fist once on the right side of his chin. Defendant then stepped back. Before defendant punched Benavides, defendant had his hands in front of him with his hands open. Benavides did not try to grab him or place him in a control hold.

After defendant hit Benavides, Stillion told him to get on the ground. Defendant complied and Stillion placed handcuffs on him. After "a couple of minutes," Stillion said, " 'Congratulations. You just got another charge.' " Defendant did not respond.

**The People's Rebuttal Case**

Benavides testified that defendant did not ask him for a newspaper.

Benavides was five feet eleven inches tall and weighed "in the upper 140s."

When Benavides and defendant came together near the elevator, Benavides stepped back and extended his left hand to grab defendant's left hand. Benavides's right arm moved back to "swing [him]self back" and he realized his back was against a gate. Benavides did not know whether his right hand was open or closed.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendant contends the evidence was insufficient to prove that he assaulted Benavides with force likely to produce great bodily harm. For that proposition, he relies

5.

upon (1) the jury's not true finding on the personal infliction of bodily injury allegation and (2) the fact that no witness testified that a punch to the head was *likely*, rather than just possible, to produce great bodily injury. The People disagree, as do we.

### A. Standard of Review

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] … We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 105–106; *People v. Friend* (2009) 47 Cal.4th 1, 41 [conflicts in the evidence are for the jury to resolve, and where a jury has credited statements by a witness, an appellate court can reject those statements only if they are physically impossible or facially false].)

"Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial." (*People v. Earp* (1999) 20 Cal.4th 826, 887–888.) Further, if the record contains substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt "the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 639.)

### B. Analysis

Defendant does not challenge the sufficiency of the evidence to meet any element of any of the offenses of conviction other than the likelihood of producing great bodily injury element.

Section 245, subdivision (c) provides, in relevant part: "Any person who commits an assault … by any means likely to produce great bodily injury upon the person of a peace officer … and who knows or reasonably should know that the victim is a peace officer … engaged in the performance of his or her duties, when the peace officer … is engaged in the performance of his or her duties, shall be punished by imprisonment …." " 'The crime … like other assaults, may be committed without infliction of any physical injury, and even though no blow is actually struck. [Citation.] The issue, therefore, is not whether serious injury was caused, but whether the force used was such as would be likely to cause it.' " (*People v. Covino* (1980) 100 Cal.App.3d 660, 667.)

"Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748.) A defendant's use of his hands alone may support a conviction of assault by means of force likely to produce great bodily injury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028; *People v. Wingo* (1975) 14 Cal.3d 169, 176.) Whether the use of hands would be likely to cause great bodily injury is to be determined by the amount of force applied and the manner and circumstances under which the force was applied. (*McDaniel*, at pp. 748–749.) Although not conclusive, the results of an assault are highly probative of the amount of force used. (*Id*. at p. 748.)

The question of whether a particular act is likely to produce great bodily injury is a question for the trier of fact and is subject to review for substantial evidence. (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1065.)

Here, in the light most favorable to the judgment, substantial evidence supported the jury's verdict. Defendant was approximately seven inches shorter than Benavides but

7.

Benavides was of a slight build (weighing no more than 149 pounds) and defendant outweighed him by approximately 40 pounds. Defendant punched Benavides on the head at least one time. The right-handed punch struck Benavides in the jaw as Benavides reached for defendant's left hand to restrain him. The punch (or punches) was of sufficient force to cause Benavides to lose consciousness. For the following several weeks, Benavides felt that his jaw was misaligned and suffered jaw pain when eating. Further, Benavides's treating doctor at Kern Medical Center testified that Benavides was assessed with a CT scan because head trauma always poses a risk of damage to the brain.

From that evidence, the jury could reasonably have concluded that defendant committed an assault with force likely to produce great bodily injury.

Defendant argues that because the doctor from Kern Medical Center did not testify to the *likelihood* of great bodily injury from a blow to the head, the evidence of likelihood of a punch producing great bodily injury was insufficient. We disagree. No expert testimony is required for a jury to determine whether certain conduct is likely to produce great bodily injury. (See *In re Nirran W.* (1989) 207 Cal.App.3d 1157, 1159–1160, 1162 [affirming a conviction for assault with force likely to produce great bodily injury resulting from a punch to the face without expert testimony on the likelihood of a punch to the face producing great bodily injury].) The jury was permitted to infer, based on the circumstances, that a heavier but shorter man punching a lighter but taller man on the face (and perhaps also on the head) with force sufficient to cause him to lose consciousness was a use of force likely to produce great bodily injury.

Similarly, defendant suggests that because the jury found that defendant did not *actually* cause great bodily injury, it should also have concluded that the assault was not likely to produce great bodily injury. Again, assault by means likely to produce great bodily injury does not require any actual injury. (*People v. Covino*, *supra*, 100 Cal.App.3d at p. 667.) From the evidence presented, the jury could reasonably have concluded that by punching Benavides on the face with force sufficient to cause him to

8.

lose consciousness, defendant assaulted Benavides with force likely to produce great bodily injury.

## II. *Miranda*

Defendant argues that his statement made to Stillion after Stillion told him that he was "going to stay a bit longer" for having punched Benavides—"I know. I don't care."—was admitted in violation of *Miranda*. The People disagree, arguing that Stillion's statement to defendant was not an interrogation or its equivalent. We agree with the People.

### A. Additional Background

On July 14, the trial court conducted an evidentiary hearing to determine the admissibility of the contested statement.

At that hearing, Stillion testified that, after he saw defendant punch Benavides, and as he was handcuffing defendant, he said something close to: "[G]ood job. Now you're going to stay here longer." Defendant responded, "I know. [¶] … [¶] I don't care." Stillion did not ask defendant any questions.

Defendant's trial counsel argued that defendant was in custody. The People agreed.

Defendant's counsel also argued that Stillion's "statement to [defendant] was directly directed at [defendant] and it was kind of a condescending, … sarcastic statement [from] which … you would expect some kind of response …. And since no *Miranda* warnings were given [defendant's statement] should be excluded." The People disagreed, arguing that the statement "was not [an interrogation]. It was a statement and the intent of the officer was not to ask any questions. It was a statement after observing what he observed …. A person has the option of responding or not in this case. The defendant did respond."

The trial court agreed with the parties that defendant was in custody and agreed with the People that "the evidence show[ed] that it was not [an] interrogation, simply an

9.

observation[,] even if it[ was] made in a sarcastic fashion by the officer when there's no suggestion that it's some sort of disguised interrogation by an officer of lengthy years of experience. … [T]his deputy[,] by his appearance[, is] about as youthful a deputy [as] I have seen." On that basis, it allowed admission of the statement.

### B. Analysis

"In reviewing the trial court's ruling on a claimed *Miranda* violation, ' "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statement was illegally obtained." ' " (*People v. Elizalde* (2015) 61 Cal.4th 523, 530.) Further, "[we] apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

The rule of *Miranda* requires that before police may question a suspect during a custodial interrogation, the suspect must be advised of the right to remain silent and to an attorney and that any statements may be used against him or her in court. (*Miranda*, *supra*, 384 U.S. at p. 479; *Rhode Island v. Innis* (1980) 446 U.S. 291, 297 (*Innis*).) "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to

10.

interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Innis*, *supra*, 446 U.S. at pp. 300–302, fns. omitted.) *Miranda* does not apply if the suspect is not being interrogated. (*Miranda*, *supra*, 384 U.S. at p. 478 ["Volunteered statements of any kind are not barred by the Fifth Amendment."].)

Under *Innis*, not all conversation between an officer and a suspect constitutes interrogation. (*Innis*, *supra*, 446 U.S. at pp. 301–302.) The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response. (*Id*. at p. 301.) A brief statement by an officer to an in-custody defendant that he is in trouble is not the functional equivalent of interrogation because it is not the type of statement likely to elicit an incriminating response. (See *People v. Haley* (2004) 34 Cal.4th 283, 296 [an officer telling an in-custody defendant that his fingerprints were found at the crime scene was not the functional equivalent of interrogation because it was not the type of statement likely to elicit an incriminating response]; see also *People v. Huggins* (2006) 38 Cal.4th 175, 197 [officers telling defendant that he was the suspect in a crime was not an interrogation or the functional equivalent].)

Here, Stillion's statement did not call for any response. He simply told defendant that he was in trouble for what Stillion had observed. Stillion's statement was brief, did not appear to be a law enforcement tactic to obtain a response from defendant, and was not the kind of statement that he should reasonably have anticipated to elicit an incriminating response. (*Innis*, *supra*, 446 U.S. at p. 303; see *Arizona v. Mauro* (1987) 481 U.S. 520, 526 [detailing several psychological ploys designed to elicit incriminating responses that operate as the functional equivalent of interrogations even though they did not involve direct questioning].)

11.

We find no error under *Miranda*.

### III.  Clerical Error

The parties agree, as do we, that the minute order reflecting the sentence contains an error.  Defendant was sentenced to a term of 25 years to life pursuant to section 667, subdivision (e)(2), on counts 1 and 2 because defendant had suffered two or more prior strike convictions.  The minute order reflecting the judgment indicates that defendant's sentence on counts 1 and 2 was "doubled pursuant to" section 667, subdivision (e)(1).[5] The minute order does not correctly reflect the trial court's oral pronouncement of sentence.

When a discrepancy exists between a trial court's oral pronouncement and the minute order, the oral pronouncement controls.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  We may correct a clerical error in recording a lower court's pronouncement at any time.  (*Ibid.*; *People v. Torres* (2020) 44 Cal.App.5th 1081, 1085.)  We therefore order the error contained in the minute order corrected.

### DISPOSITION

The trial court is ordered to prepare an amended minute order correctly reflecting the judgment:  defendant was sentenced to 25 years to life pursuant to section 667, subdivision (e)(2) on counts 1 and 2; his sentence was not doubled pursuant to section 667, subdivision (e)(1).  The judgment is affirmed.

---

[5]     The minute order cites to section 667, subdivision (e); it does explicitly not reference subdivision (e)(1), but that subdivision requires that the sentence on a count be doubled if the defendant had suffered one prior strike conviction.