Filed 5/26/22  In re R.G. CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.G., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>               v.<br><br>R.G.,<br><br>        Defendant and Appellant. | F082747<br><br>(Super. Ct. No. JJD071612)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Tulare County.  John P. Bianco, Judge.

Candice L. Christensen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General,  Michael A. Canzoneri and Heather S. Gimle, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]        Before Levy, Acting P. J., Smith, J. and DeSantos, J.

-ooOoo-

R.G., (minor) appeals from a disposition order adjudging him a ward of the juvenile court and committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ). On appeal, minor argues that (1) insufficient evidence supported the juvenile court's finding that he was a perpetrator of the charged offenses and (2) the juvenile court abused its discretion in committing him to DJJ. The People disagree. We affirm.

## PROCEDURAL SUMMARY

On June 26, 2018, the Tulare County District Attorney filed a juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)[1]) alleging minor possessed a folding knife on school grounds (Pen. Code, § 626.10, subd. (a); count 1).

On September 18, 2018, minor was granted informal probation (§ 654.3) and was warned against further involvement in gang activity.

On March 12, 2019, the Tulare County District Attorney filed a first amended juvenile wardship petition (§ 602, subd. (a)) realleging count 1, and also alleging minor committed second degree robbery (Pen. Code, § 211; count 2) and disturbing the peace by fighting (Pen. Code, § 415, subd. (*l*); count 3). The petition further alleged that minor committed count 2 for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C)) and count 3 for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (d)).

On April 12, 2019, minor admitted the allegations of the first amended petition. The juvenile court indicated that it would declare minor a ward of the court and place him on probation, and it could grant him a deferred entry of judgment. It calculated minor's maximum term of confinement as four years four months.

---

**1** All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

On April 26, 2019, the juvenile court declined to grant minor a deferred entry of judgment, finding he was ineligible because he failed informal probation. Instead, it declared minor a ward of the juvenile court and placed him on formal probation. The court further warned minor that if he did not "stay away from drugs … alcohol, … and … gang involvement" that he would be placed "in an in-custody program …."

On December 20, 2019, the Tulare County District Attorney filed a second amended juvenile wardship petition (§ 602, subd. (a))alleging minor committed two counts of assault with a deadly weapon, a knife (Pen. Code, § 245, subd. (a)(1); counts 1 & 6), assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count 2), attempted first degree murder (Pen. Code, §§ 187, subd. (a), 664; count 3), and two counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2); counts 4 & 5). The petition further alleged that minor committed counts 1, 2, and 6 for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(B)) and counts 3, 4, and 5 for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C)). As to counts 3, 4, and 5, the petition further alleged that a principal in the offense personally used a firearm (Pen. Code, § 12022.53, subds. (b), (e)(1)) and minor personally used a firearm (Pen. Code, §§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)). As to counts 3 and 4, the petition further alleged that minor personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)) and a principal in the offense personally discharged a firearm causing great bodily injury (Pen. Code, § 12022.53, subds. (c), (d) and (e)(1)).

On January 17, 2020, minor pled no contest to the lesser offense of battery with serious bodily injury (Pen. Code, § 243, subd. (d)) on count 1 of the second amended petition in exchange for dismissal of count 2 and the enhancements alleged in relation to counts 1 and 2.

On the same date, after a contested jurisdictional hearing, the juvenile court found counts 3, 4, and 5 true beyond a reasonable doubt. The juvenile court found that count 6

3.

and all the special allegations as to all counts were not proved beyond a reasonable doubt and dismissed that count and the allegations.

On January 31, 2020, minor admitted that he violated the terms of his probation.

On February 21, 2020, the juvenile court continued minor as a ward of the court, removed from the custody of his parent, placed minor on probation, and committed him to the long-term program. The juvenile court again warned minor that if he "continue[d] to hang around with Norteno[ gang members] while [he was committed to the long-term program] and … continue[d] to engage in [assaultive behavior], [he] … will go to DJJ." The court found minor's maximum term of confinement was life plus five years.

On December 15, 2020, minor was released from the long-term program to the custody of his mother and under the supervision of the probation officer.

On February 16, 2021, the Tulare County District Attorney filed a petition alleging minor was in violation of his probation (§ 777, subd. (a)). The following day the Tulare County District Attorney filed a juvenile wardship petition (§ 602, subd. (a)) alleging minor committed carjacking (Pen. Code, § 215, subd. (a); count 1) and assault with a deadly weapon, a firearm (Pen. Code, § 245, subd. (a)(1); count 2). As to count 1, the petition further alleged that minor personally used a firearm (Pen. Code, § 12022.53, subd. (b)). As to count 2, the petition further alleged that minor caused great bodily injury (Pen. Code, § 12022.7, subd. (a)).

On March 11, 2021, after a contested jurisdictional hearing, the juvenile court found allegations of the violation of probation and wardship petitions, including the special allegation, true.

On April 27, 2021, the juvenile court committed minor to DJJ. It calculated minor's aggregate maximum term of confinement at life plus 28 years.

On May 6, 2021, minor file a notice of appeal.

4.

## FACTUAL SUMMARY[2]

### The People's Case

On February 12, 2021, R.R. drove his red 2015 sedan (the sedan) from Orosi to Cutler to meet his friend Diana R. at her mother's apartment. R.R. drove Diana and Diana's female friend to Woodlake. Diana did not know where she wanted to be dropped off. She eventually directed R.R. to a location to park. He did so and they waited for Diana's friends to pick her and her female friend up.

Two males, one approximately five feet and seven inches and the other approximately five feet and four to six inches, both wearing black clothing, walked toward the sedan. The two males wore hooded sweatshirts or hats and had handkerchiefs tied around their faces. R.R. "could barely see their eyes." R.R. asked Diana if they were her friends. She did not answer. One of the males attempted to open the rear driver's side door to the sedan but it was locked. R.R. attempted to drive away but Diana, who was sitting in the passenger seat, turned the vehicle off. Both males then came to the front driver's side window, broke the window, pointed handguns at him, and said " 'Open your door, open your door.' "

One or both of the males opened the front driver's side door to the sedan by reaching through the broken window. One or both of the males then struck R.R. five times with a handgun, including three times to the head. They then threw R.R. to the ground, got into the sedan, and drove away. R.R. called out to people walking along the street. A group stopped and called 911. Soon after, police officers and an ambulance arrived.

R.R. had "been in trouble with the law" "many times." The last time he got in trouble was about 15 years prior to his testimony.

---

[2]     Because minor's challenges to the disposition relate only to the February 17, 2021, wardship petition, we provide only a summary of the facts relating to that petition.

5.

On February 12, 2021, City of Woodlake Police Officers Zachary Fleeman and Jared Winter responded to the 911 call. They arrived at 9:43 p.m., within one or two minutes of the call and about 10 minutes after the carjacking, to find R.R. "in a state of panic, crying and screaming, [and] asking for help." R.R. appeared to be "[v]ery injured"; he had a laceration to the back of his head and his shirt and pants were soaked with blood.

On February 12, 2021, just before 10:00 p.m., Tulare County Sheriff's Deputy Robby Hebrard was working a patrol detail when he was advised by a dispatcher to be on alert for the sedan. Hebrard and his partner positioned themselves in an area through which they expected the driver of the sedan may travel. Hebrard saw the sedan and conducted a vehicle stop. When the vehicle came to a stop, he ordered all of the occupants to exit. Two males and two females exited the vehicle. Diana was the driver, one of the males sat in the front passenger's seat, minor sat in the rear passenger's side seat, and Diana's female friend sat in the rear driver's side seat. The male in the front passenger seat wore a black hooded sweatshirt and black jeans; minor wore a black hooded sweatshirt and blue jeans.[3] Diana's female friend was found to have a handgun in her waistband. The handgun contained a magazine and had a live round loaded in the chamber. Hebrard did not notice any blood on the gun.

At 10:00 p.m., Fleeman and Winter were dispatched to the location where the sheriff's deputies had stopped the sedan. Winter observed minor in the sheriff's deputies' custody, wearing a black hat, black hooded sweatshirt, and jeans. Winter later drove the route from where he and Fleeman originally encountered R.R. to where the sheriff's deputies had stopped the sedan. The distance between the two points was 18.4 miles. It took Fleeman 23 minutes 45 seconds to drive the route at 9:00 p.m., on a different night with very minimal traffic. In the days after minor's arrest, Winter drove the same route

---

**3**     Hebrard also indicated that minor was wearing "all black."

to see if any evidence had been discarded.  He found none.  He did not attempt less-direct alternate routes.

Fleeman observed blood on Diana's sweatshirt when she was taken to the police station.  He did not recall seeing blood on minor or the other male and did not record seeing blood on minor in his report.

**Minor's Case**

On the day when minor was arrested, he had been "hanging out" at his aunt's house in Yettem.  He was going back to Cutler with his friends Robert and Diana in the sedan that he believed belonged to his friend Diana's mother.  Diana picked minor up and told minor that she had to take the sedan back to her mother.  On their way to return the sedan to Diana's mother, they were pulled over.  Minor had only been in the sedan for about 10 minutes when it was pulled over.  He did not remember what time he had been picked up.

## DISCUSSION

### I. Sufficiency of the Evidence

Minor contends the evidence was insufficient to sustain the juvenile court's finding that he committed the charged offenses.  Specifically, he argues that the evidence was insufficient to establish that he was one of the perpetrators of the offenses.  We disagree.

> " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the [disposition order] to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find [the allegation true] beyond a reasonable doubt." [Citations.]  We presume in support of the [disposition order] the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] … We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.]  'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support

a [disposition order].' " (*People v. Brown* (2014) 59 Cal.4th 86, 105−106; see *In re M.V.* (2014) 225 Cal.App.4th 1495, 1518 ["The standard of review in juvenile proceedings involving criminal behavior is the same as that required in adult criminal trials …."].)

"Where, as here, the [juvenile court's] findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial." (*People v. Earp* (1999) 20 Cal.4th 826, 887–888.) Further, if the record contains substantial evidence from which a reasonable trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt "the possibility that the trier of fact might reasonably have reached a different conclusion does not warrant reversal." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 639.)

The purportedly insufficiently proven element in this case was minor's identity as a perpetrator of the carjacking and assault with a deadly weapon. We disagree that the evidence was insufficient to establish minor's identity as a perpetrator of the offenses.

Here, substantial circumstantial evidence supported the juvenile court's finding that minor was a perpetrator of the offenses. Because his assailants were masked and he could only see their eyes, R.R. was only able to identify his assailants as males of approximately five feet seven inches and five feet four-to-six inches, clad in all black with hooded sweatshirts or black hats who drove away in his sedan. Roughly 27 minutes

8.

later,[4] minor who was five feet four inches tall,[5] was found in the stolen sedan wearing black clothing and a black hat.  The distance from the location of the carjacking to the location of the sedan when it was stopped by sheriff's deputies was 18.4 miles.  In very light traffic, it took Fleeman about 23 minutes 45 seconds to drive the same route.  Minor's presence in the vehicle approximately 27 minutes later, with three others whom all met the description provided by R.R. of the vehicle's occupants, constituted substantial evidence of minor's identity as a perpetrator of the offense.

Minor argues that the identity evidence was insufficient because R.R. could not identify him as a perpetrator of the offense, "there was no substantial evidence to put [him] at the crime scene at the time the crime occurred[,]" the location of the stop was near to the location from which [he] testified he was picked up, only one firearm was found in the vehicle, and "no blood [was] found on [him], only on Diana."  His arguments are unpersuasive.

First, eyewitness identification is but one way to identify a perpetrator.  A perpetrator's identity need not be proved with direct evidence; circumstantial evidence can suffice.  (*People v. Abilez* (2007) 41 Cal.4th 472, 504; *People v. Catlin* (2001) 26

---

**4**    Fleeman and Winter arrived at the scene of the carjacking at 9:43 p.m.  Fleeman estimated that the carjacking had taken place about 10 minutes before they arrived.  At 10:00 p.m., Fleeman and Winter were dispatched to the location where sheriff's deputies had stopped the sedan.  Minor suggests that the "entire time period was not 27 minutes, as argued by the prosecution, but 59 minutes."  He reasons "[i]t thus appears that the perpetrators left by 2141 hours and were not apprehended until shortly before 2200 hours."  He appears to have miscalculated the time.  By minor's time estimate—which does not appear consistent with the testimony that the carjacking occurred 10 minutes before Fleeman and Winter arrived—the vehicle stop actually happened about 19 minutes after the carjacking.

**5**    The California Bureau of Firearms Report of Firearm Prohibition dated February 27, 2020, and April 28, 2021, and the probation officer's reports filed January 30, 2020, and March 23, 2021, all reflect minor's height as five feet four inches.  The juvenile court observed minor at the jurisdictional hearing and was in a position to see his height.

9.

Cal.4th 81, 142; *People v. Bean* (1988) 46 Cal.3d 919, 933.) Here, the circumstantial evidence of minor's identity as a perpetrator—his presence in the sedan soon after the carjacking with others who met the description of the involved parties, and his description matching that of one of the assailants, in both attire and height—was compelling.

Second, minor argues that "there was no substantial evidence to put the minor at the crime scene at the time the crime occurred." He relies upon an incorrect time calculation that the carjacking occurred roughly an hour before sheriff's deputies stopped the stolen sedan to support his testimony that he was picked up by Diana about 10 minutes before the vehicle stop. That argument is unsupported by the record. The proximity in time between the carjacking and vehicle stop, minor's presence in the sedan, and minor's appearance matching R.R.'s description all linked him to the offense and the scene of the carjacking.

Third, minor argues that the evidence suggested it was possible that Diana had actually picked minor up from his aunt's house prior to the vehicle stop. He directs our attention to the distance between Yettem (where minor testified his aunt lives) and the location of the vehicle stop and again to the miscalculated duration of time between the carjacking and the vehicle stop. Even assuming sufficient time existed in which Diana could have dropped off one of the perpetrators and picked minor up, the other evidence makes such a scenario implausible. Again, the evidence was sufficient for the juvenile court to conclude that minor was a perpetrator of the offenses.

Fourth, minor emphasizes the absence of a second firearm in the vehicle, the fact that the firearm was in the possession of another, and the absence of any blood on his person at the time of the stop. The absence of a second firearm or visible blood on minor's clothing did not render the evidence before the juvenile court such that a reasonable trier of fact could find the allegations of the petition true beyond a reasonable doubt. One of the minors could easily have discarded a firearm on the more than18-mile

10.

drive from the location of the carjacking to the location of the vehicle stop. The fact that police officers did not discover a discarded firearm along the route in the following days is not dispositive. As Winter noted, he took only one of the possible routes from the carjacking location to the location of the vehicle stop. Nor is the absence of blood on minor's clothing a clear indication that he was not a perpetrator of the offense. As the People note, minor wore black clothing and blood may not have been visible on such clothing even if it existed.

In short, sufficient evidence supported the juvenile court's determination.

## II.  DJJ Commitment

Minor next argues that the juvenile court abused its discretion in committing him to DJJ instead of returning him to the long-term program. The People disagree, as do we.

### A.  Additional Background

The probation officer's report detailed the commitment alternatives the court could consider and recommended against them: It recommended against home placement or replacement in the long-term program. It explained that placement in the long-term program was not suitable because "it appears the minor needs a more restrictive placement option to fully address his aggressive behavior" and "a more substantial period of time in custody, in order to adequately address his criminogenic needs." The probation officer further noted that while committed to "the Long Term Program[,] the minor received five Incident Reports for disruptive behavior, possession of contraband, sexual misconduct, failing to follow instructions, and gang behavior and activities."

Instead, the probation officer's report recommended DJJ placement and detailed its reasoning: "the length of commitment at the [DJJ], and the available services including Aggression Interruption Training (ten-week cognitive behavioral intervention to improve social skills and control anger) and Counter Point [*sic*] (thirty-three session cognitive behavioral program with a goal to reduce the risk of reoffending), will allow

the minor sufficient time to gain the tools he needs to refrain from further delinquent behavior."

The juvenile court explained its commitment determination:

"The Court has, as indicated, considered the probation report. The Court has also considered the arguments of counsel.

"In determining the appropriate disposition, the Court does have to look to the least restrictive alternative; however, if that alternative has been ineffective or inappropriate, that is what the Court can consider.

"[Minor] appeared before this Court a little over a year ago. At that time the recommendation was DJJ based on rather serious charges that the Court heard the trial on. The Court, at that point, determined that because [minor] had not received the benefit of a JDF commitment, the Court did not follow the recommendation of DJJ, but rather, placed the minor in the detention facility in a long-term program.

"While the minor did not appear to create — pick up any new offenses while in the long-term program, the Court notes that he was initially released in aftercare on December 15th of 2020. He was within 16 days placed on an aftercare hold because he failed to comply with the terms of aftercare. He was, again, released and that was on December 31st.

"He was, again, released into aftercare on January 8th, and then within a little over a month he picked up a violation of probation and this new offense.

"The Court believes that the minor has been given an opportunity at the detention facility and the minor has failed to reform.

"The Court notes that the programs offered at DJJ are substantial and would be beneficial to the minor.

"As to the fact that the Senate Bill [No.] 823 [(2019−2020 Reg. Sess.) (Senate Bill 823)] and the pending Senate Bill to clean up 823, which is pending, contemplate in the near future that the DJJ will close and that the responsibility for housing minors who commit serious offenses will be local, we are not at that point.

"The programs that are available have not been approved by the State, nor have they even been presented to the Court from Probation as to

what programming will be available effective July 1st.  Whether the programming will, in fact, be available July 1st is questionable.

"It is not contemplated that DJJ will close on July 1st, but rather, it is anticipated that DJJ will continue to operate for at least a few years, at which point the minors may be transferred to a local commitment — a local detention facility, if there is one available in that county.  But that is not a basis — the fact that Senate Bill 823 passed last year in and of itself is not a basis to not commit the minor to DJJ.

"The bottom line is that, [minor], a year ago — a little over a year ago, I told you you needed to make a decision on how you wanted to spend your life.  If you continued down the path you were going on, hanging around with gang members and involving yourself in criminal activity, that you'd likely spend the rest of your life behind bars, and you needed to make a choice on how you wanted to live your life.

"I gave you an opportunity to gain some insight at the long-term — under the long-term program, and it appears, based on your actions since you've been released from the detention facility, that you did not change your attitude.

"This was another gang offense in which you seriously assaulted and victimized an individual, unrelated to gangs, and it appears to this Court that you did not benefit, and that the local detention facility was not successful in rehabilitating you.

"So the Court is going to adopt the recommendation and commit you to DJJ."

**B. Analysis**

We review a juvenile court's commitment decision for abuse of discretion.  (*In re A.R.* (2018) 24 Cal.App.5th 1076, 1080 (*A.R.*).)  In reviewing a decision for abuse of discretion, we make all reasonable inferences in support of the trial court's determination. (*Ibid.*)  " 'A DJJ commitment is not an abuse of discretion where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate.' " (*Ibid.*)

" 'Although the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been

13.

attempted.' " (*A.R.*, *supra*, 24 Cal.App.5th at pp. 1080–1081; accord, *In re Eddie M.* (2003) 31 Cal.4th 480, 507; *In re Carlos J.* (2018) 22 Cal.App.5th 1, 6.) ["A juvenile court may properly consider 'a restrictive commitment as a means of protecting the public safety.' "].) "A juvenile court must determine if the record supports a finding that it is *probable* the minor will benefit from being committed to DJJ." (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486.) There is no requirement that the court expressly find exactly *how* a minor will benefit from the commitment. (*Ibid.*) Nor must the juvenile court expressly state on the record its reasons for rejecting less restrictive placements. (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1159.) But the record must contain some evidence that the court concluded DJJ placement would benefit the minor and appropriately considered and rejected reasonable alternative placements. (*A.R.*, at pp. 1080–1081; *Nicole H.*, at p. 1159; *Jonathan T.*, at p. 486.)

In reviewing a commitment determination, we remember that " 'the primary goal behind maintaining separate courts and procedures for adults and minors is to ensure that juvenile offenders who have not yet become hardened criminals receive treatment and rehabilitation.' " (*In re Carlos E.* (2005) 127 Cal.App.4th 1529, 1542.) That goal is reflected in the mandate that juvenile courts consider "the protection of the public as well as the rehabilitation of the minor" in reaching a disposition. (*Ibid.*) The court is required to "consider 'the broadest range of information' in determining how best to rehabilitate a minor and afford him adequate care." (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329.)

Here, the juvenile court considered the programs available for minor at DJJ as detailed in the probation officer's report. The court concluded that the aggression interruption training, Counterpoint program, and a longer potential time of confinement would be of probable benefit to minor. It considered the program availability at the long-term program and determined that DJJ provided a more beneficial set of rehabilitative programs.

Next, the juvenile court considered less restrictive alternative placements and determined that they had failed to reform the minor and provide him with the services he needed to be successful. Minor argues that he performed well in the long-term program and should have been recommitted. Minor conflates not accruing new wardship petitions while in the long-term program with successful reformation through the long-term program. In the long-term program, minor had five incident reports. Within 16 days of his release from the long-term program, he was placed on an aftercare hold for having failed to comply with the terms of aftercare. Roughly a week later, he was released again. Approximately a month later, minor committed the present offenses. On that record, the juvenile court's conclusion appears very reasonable.

We find no abuse of discretion.[6]

## DISPOSITION

The disposition order is affirmed.

---

**6** Minor contends that if we found the disposition order was not supported by sufficient evidence or the DJJ placement decision was an abuse of discretion, we would be required to direct the juvenile court on remand to consider Senate Bill 823 in reaching a new disposition. Because we conclude substantial evidence supported the disposition order and the juvenile court did not abuse its discretion in committing minor to DJJ, we need not address that argument.

We note that in 2020 the Legislature passed "juvenile justice realignment" through Senate Bill 823 (Stats. 2020, ch. 337.) "Effective July 1, 2021, newly enacted section 736.5 shifts responsibility for convicted youth offenders from DJJ to the county level. (§ 736.5, subd. (a).) All wards committed to DJJ prior to July 1, 2021, will remain in DJJ custody. (*Id.*, subd. (d).) But pending final closure of DJJ in June 2023, a court may *only* make a DJJ commitment if the minor 'is otherwise eligible to be committed under existing law and in whose case a motion to transfer the minor from juvenile court to a court of criminal jurisdiction was filed.' [(*Id.*, subds. (b), (c), (e)]; see also § 733.1, subds. (a)–(b).)" (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 907.)

At the time of the disposition in this case, Senate Bill 823 was not yet effective.

15.